HARTFORD ELECTRIC SUPPLY COMPANY *v.*
ALLEN-BRADLEY COMPANY,
INC., ET AL.
(SC 16011)

Callahan, C. J., and Berdon, Norcott, Katz and Palmer, Js.

Argued March 25—officially released August 24, 1999

*Paul D. Sanson*, with whom were *Sheila A. Huddleston* and, on the brief, *Charles L. Howard*, for the appellant (substitute defendant Allen-Bradley Company, LLC).

*Edward F. Hennessey*, with whom were *David T. Ryan*, *Linda L. Morkan* and, on the brief, *Austin J. McGuigan*, for the appellee (plaintiff).

*Brian A. Lema*, *Robert L. Berchem* and *Anthony V. Avallone* filed a brief for the Manufacturing Alliance of Connecticut, Inc., as amicus curiae.

*Steven D. Ecker* filed a brief for the Connecticut Beer Wholesalers Association as amicus curiae.

*Opinion*

BERDON, J. In this appeal, the defendant Allen-Bradley Company, LLC,[1] claims that the trial court improperly found that, under the Connecticut Franchise Act (franchise act), General Statutes §§ 42-133e through 42-133h: (1) a franchise relationship existed between the defendant manufacturer and the plaintiff distributor, the Hartford Electric Supply Company;[2] and (2) the defendant did not have "good cause" to terminate the franchise relationship.[3] The defendant also argues that the trial court improperly found that the defendant violated the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; when it attempted to terminate its contract with the plaintiff.[4]

The trial court set forth the following relevant facts and procedural history. The defendant, a manufacturer of high-tech industrial automation products, nationally assigns distributors for specific geographic territories

[1] Allen-Bradley Company, LLC, which was substituted for Allen-Bradley Company, Inc., is the only defendant for the purposes of the present appeal. While there were also two individual defendants named in the plaintiff's complaint; see footnote 10 of this opinion; references herein to the defendant are to Allen-Bradley Company, LLC.

[2] General Statutes § 42-133e (b) provides in relevant part: " 'Franchise' means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate . . . ."

[3] General Statutes § 42-133f (a) provides in relevant part: "No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement . . . ."

[4] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

in which to market and sell its products. The plaintiff is a distributor of electrical supplies and equipment that has been an authorized distributor of the defendant's products for more than fifty years. It employs fifty-six persons and maintains offices in West Hartford and Milford. One half of the plaintiff's $20 million annual business is derived from the sale of the defendant's products. In addition, many of its other products, such as wires and switches, are sold as complements to the defendant's products.

The "Appointed Distributor Agreement" (agreement)[5] that governs the relationship between the parties grants the plaintiff the right to market and sell products bearing the defendant's trademark within certain counties in Connecticut.[6] The current agreement, dated August 9, 1991, was initially effective for a one year term, subject to automatic renewal each year. According to the agreement, "either party may terminate [it] at any time, with cause or without any cause," on ninety days notice.

The trial court found that the agreement requires the plaintiff to prepare a business plan that includes targeted accounts, a promotion program, a sales forecast, a training plan, an inventory plan, and demonstration equipment. Although the plaintiff retains the ultimate authority over whom to employ, the trial court found that the defendant "exert[s] enormous pressure" on the plaintiff to hire specialists for its products, and sales and operations managers. Similarly, the trial court found that the defendant requires the plaintiff's employees to be trained extensively regarding the defendant's products. The agreement provides, in relevant part, that

---

[5] References to the agreement include both the Appointed Distributor Agreement and its addendum.

[6] The agreement does not prohibit the plaintiff from selling products other than those of the defendant.

"distributors are expected to participate in training conducted locally, at the factory and in regional locations."

In addition, the defendant substantially controls the plaintiff's level of inventory of the defendant's products. The agreement requires the plaintiff to maintain an inventory of the defendant's products at a level that allows the plaintiff to meet its customers' needs, dictates minimum purchase amounts of certain products, and grants the defendant's local office permission to determine the exact level and mix of inventory required or, in the alternative, allows the defendant's area manager and the plaintiff to agree upon required levels of inventory. The court further found that the defendant had the power to examine the plaintiff's financial records and require audits. Pursuant to the agreement, the plaintiff is required to maintain both sales records of the defendant's products and business records "reflecting the true financial condition and operating records of [the plaintiff's] business." Beyond the plaintiff's inventory and finances, the defendant effectively controls the ultimate price of its products because the defendant prints a catalog with sale prices for the plaintiff to use when selling the defendant's products.

The trial court also found that throughout 1990 and 1991, the plaintiff suffered weakened sales that mirrored the correspondingly infirm Connecticut economy. Consequently, in a letter dated February 12, 1992, the defendant placed the plaintiff on its "Distributor Concern Program" (program), which is designed to support distributors whose sales have failed to meet the defendant's standards, but also contains the threat of termination if the sales of the distributors in the program do not improve adequately.[7] When placing the plaintiff on the program, the defendant identified the following

---

[7] The letter placing the plaintiff on the program concludes that "unsatisfactory performance could result in termination of your appointment . . . ."

areas of concern: the plaintiff's inadequate sales performance, sales promotion, staffing, training, customer service, and number of specialists for the defendant's high technology drives, as well as its lack of a proactive effort to identify new business. The defendant demanded improvement in each of these areas before it would remove the plaintiff from the program.

While the plaintiff's sales were sagging and it was trying to function within the parameters of the program, Blaise P. DePasquale,[8] the plaintiff's president and chief executive officer, was involved in litigation with his elderly father over who rightfully owned and controlled the plaintiff. In 1994, as a part of the resolution of that action, DePasquale purchased the company from his father.

During the defendant's 1994 fiscal year, which ran from October 1, 1993, through September 30, 1994, the plaintiff's purchase of the defendant's products increased by more than 20.6 percent from the prior year. In the following fiscal year of 1995, the plaintiff's purchases rose another 22.5 percent, which was 3.5 percent above the defendant's national sales growth that year.[9] At an April, 1995 meeting between the parties, the defendant approved the plaintiff's business plan setting forth growth goals, and removed it from the program. Subsequently, at an October, 1995 meeting, the defendant expressed its satisfaction with the plaintiff's performance for the 1995 fiscal year.

Only one week later, however, Joseph Lupone, one of the defendant's managers, Dan Fadden, the plaintiff's then director of sales and marketing, and Roy Lusk, the

---

[8] Blaise P. DePasquale is known as Bill DePasquale.

[9] The plaintiff's improved performance in the 1995 fiscal year corresponded with the hiring of Dan Fadden as director of sales and marketing and Roy Lusk as director of operations.

plaintiff's then director of operations, met clandestinely. At the meeting, both Fadden and Lusk accused DePasquale of having poor management practices and engaging in unethical conduct. Robert Daub, another manager of the defendant, met with Fadden at a second covert meeting in November, 1995. Fadden then repeated his criticisms of DePasquale. The trial court found that, henceforth, the parties' relationship deteriorated. In December, 1995, Lusk left the plaintiff's employment and in February, 1996, Fadden left as well.

The trial court further found that before the start of 1996, the defendant began to complain once again to the plaintiff that it was not meeting the goals of its plan. The plaintiff's April to December, 1995 sales had once again decreased. As a result, on January 22, 1996, the defendant placed the plaintiff on the program for a second time, asserting the following reasons: (1) inadequate staffing; (2) inadequate participation in defendant sponsored programs, promotions and seminars; (3) inadequate training of certain categories of sales personnel; (4) the lack of a staff member devoted to addressing growth areas outlined in the plaintiff's April, 1995 presentation to the defendant; and (5) the departure of and failure to replace Lusk and the related concern over internal conflicts within the plaintiff's organization.

On April 26, 1996, in response to the defendant's continual, extensive monitoring of the plaintiff's activities and the fact that a forty-eight year old employee of the plaintiff had just prior to that time suffered a heart attack due to work-related stress, an angered DePasquale sent the defendant a letter. The letter provides in relevant part: "[The plaintiff] has provided outstanding productivity for [the defendant] in a difficult and still declining Connecticut economy. But instead of praise and support we are deluged with absurd and repetitive demands for paperwork of all kinds, with

criticism of our staff, with insistence we hire new employees and reassign or get rid of existing ones and with continuing efforts by [the defendant] to diminish our stature in the marketplace and to spread the seeds of discontent among our people. This, however, is going to stop.

"We now find our days are consumed with trying to deal with increasingly irrational behavior by [the defendant's] personnel. . . .

"So, as we said in the beginning, enough is enough. We are not going to let you or anyone else from [the defendant] push us around anymore. . . .

"[The plaintiff] will work as hard as ever to market your goods. . . . Otherwise you will leave us alone to do what we have always done well—sell your products, service them and keep our customers satisfied. Forget remediation programs and your probationary threats. Our franchise agreement does not compel us to endure this from you. . . ."

Soon thereafter, on May 22, 1996, Daub and Lupone recommended to Dan Reshel, the defendant's director of distribution sales, that the defendant terminate the parties' agreement. Reshel responded by sending a letter dated June 27, 1996, informing the plaintiff that the defendant intended to terminate the agreement as of September 30, 1996. The letter listed the following reasons for termination: (1) the defendant's disappointing four year experience with the plaintiff under the program; (2) the plaintiff's lack of a stable, knowledgeable, and experienced management team to market and sell the defendant's products; (3) the plaintiff's failure to train adequately its employees regarding the defendant's products and procedure, and a lack of committed products specialists; (4) the plaintiff's poor market share and weak sales of the defendant's products; (5)

an inadequate commitment to participate in the defendant's product promotions; and (6) a lack of a cooperative working relationship that had developed into the "recalcitrant and sometimes belligerent attitude" of the plaintiff.

On July 7, 1996, in conjunction with the present action instituted by the plaintiff, the trial court granted the plaintiff's application for an ex parte temporary injunction restraining the defendant from refusing to continue its commercial relationship with the plaintiff until further order from the court. The plaintiff's complaint alleges that the plaintiff and the defendant had a franchise relationship. It further alleges that the defendant: (1) violated the franchise act; (2) breached the parties' contract; (3) breached the implied covenant of good faith and fair dealing; and (4) violated CUTPA.[10] The plaintiff's complaint seeks a permanent injunction, and compensatory and punitive damages.

On October 8, 1996, the trial court commenced a full hearing on the plaintiff's right to a permanent injunction on the basis of the alleged violations of the franchise act and CUTPA.[11] On February 10, 1997, before the hearing had finished, the defendant sent the plaintiff a letter congratulating it on being one of only twenty-one distributors nationwide to order $10 million worth of the defendant's products during the 1996 fiscal year, a copy of which was entered as an exhibit in the present case. Subsequently, the trial court issued a partial judgment in favor of the plaintiff, holding that the parties had a franchise relationship and that the defendant had violated both the franchise act and CUTPA. The

---

[10] In addition, the complaint alleges that the defendants Robert A. Daub and Joseph Lupone violated CUTPA and tortiously interfered with the parties' contract. These claims are to be tried before a jury.

[11] The remaining counts against the defendant are to be tried before a jury. The damages claims against [the defendant] based on violations of the franchise act and CUTPA are still pending as well.

judgment also permanently enjoined the defendant from terminating or refusing to continue its franchise relationship with the plaintiff.

The defendant filed timely motions for permission to appeal the partial judgment of the trial court, pursuant to Practice Book § 61-4 (a), which requires an aggrieved party to receive permission, from the trial court and the chief judge of the appellate court that has appellate jurisdiction, to appeal a judgment that disposes of at least one, but not all, causes of action.[12] After the trial court and Judge Foti[13] of the Appellate Court granted the aforementioned motions, the defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1, and General Statutes § 51-199 (c). On appeal, the defendant claims that the trial court improperly found that: (1) pursuant to § 42-133e (b),[14] a franchise relationship existed between the defendant and the plaintiff; (2) pursuant to General Statutes § 42-133f (a),[15] the defendant did not have "good cause" to terminate the franchise relationship; and (3) the defendant had violated CUTPA[16] when it attempted to terminate the agreement.

I

As a preliminary matter, we shall examine the legislative history of the franchise act. This history reveals

---

[12] Practice Book § 61-4 (a) provides in relevant part: "[A] judgment [that disposes of only a part of a cause of action] shall be considered an appealable final judgment *only if* the trial court makes a written determination that the issues resolved by the judgment are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified, and the chief justice or chief judge of the court having appellate jurisdiction concurs. . . ." (Emphasis in original.)

[13] Judge Foti, the most senior Appellate Court judge, acted on the motion because Chief Judge O'Connell had recused himself.

[14] See footnote 2 of this opinion.

[15] See footnote 3 of this opinion.

[16] See footnote 4 of this opinion.

that it was enacted in order to try to equalize the distribution of power between franchisees and franchisors. Although the bill was originally adopted in 1972 because the legislature believed that large oil companies were taking advantage of local gasoline station dealers, the legislature enacted the franchise act in a form broad enough to cover virtually every type of franchise. 15 H.R. Proc., Pt. 7, 1972 Sess., pp. 2776–95. Representatives Albert R. Webber, Darius J. Spain and Ronald A. Sarasin all remarked on the breadth of the bill during the debate before the House of Representatives over the original passage of the bill. Id., pp. 2786–88. Representative Sarasin explained that, in addition to car dealerships as discussed by some of his peers,[17] the bill would cover virtually every kind of franchise, including, but not limited to, "the Avon lady . . . the Tupperware lady . . . Holiday [Inn], Ramada [Inn] and Howard Johnson motels . . . and fast-food service operations . . . ." Id., p. 2788.

The franchise act's remedial purpose, to prevent a franchisor from unfairly exerting economic leverage over a franchisee, indicates that the statute should be read broadly in favor of the plaintiff. *Petereit* v. *S.B. Thomas, Inc.*, 63 F.3d 1169, 1180 (2d Cir. 1995), cert. denied, 517 U.S. 1119, 116 S. Ct. 1351, 134 L. Ed. 2d 520 (1996); *Muha* v. *United Oil Co.*, 180 Conn. 720, 728, 433 A.2d 1009 (1980) (franchise act is "remedial in nature and should be liberally construed in favor of the class sought to be benefited").

Our analysis begins with the appropriate standard of review. We have long held that a finding of fact is reversed only when it is clearly erroneous. See, e.g., *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 616, 711 A.2d 688 (1998). A factual finding is clearly erroneous when it

---

[17] See, e.g., 15 H.R. Proc., supra, p. 2781, remarks of Representative Michael L. Morano.

is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. Id. Simply put, we give great deference to the findings of the trial court because of its function "to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Rostain* v. *Rostain*, 214 Conn. 713, 716, 573 A.2d 710 (1990). For example, we examine the trial court's finding of no "good cause" under a clearly erroneous standard of review. See *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 64–65, 699 A.2d 101 (1997) (applying clearly erroneous standard to trial court conclusion that plaintiff was not control person pursuant to General Statutes [Rev. to 1993] § 36-498 [c]).

To the extent that the defendant challenges the trial court's interpretation of the franchise act, however, we will conduct a plenary review. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 26, 717 A.2d 77 (1998) ("[s]tatutory construction is a question of law and therefore our review is plenary"). Thus, where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set forth in the trial court's memorandum of decision. *Jaworski* v. *Kiernan*, 241 Conn. 399, 405, 696 A.2d 332 (1997). It is well settled that statutory construction involves a reasoned search for the legislature's intent, focusing on the language of the statute, its legislative history, including the purpose and policies behind its enactment, and its place within the relevant statutory scheme. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 26–27. Although the United States District Court for the District of Connecticut and the United States

Court of Appeals for the Second Circuit, have interpreted the franchise act numerous times, Connecticut appellate courts have examined the franchise act in only two opinions. *Muha* v. *United Oil Co.*, supra, 180 Conn. 728–29 (analyzing § 42-133e [b] [2]); *Southland Corp.* v. *Vernon*, 1 Conn. App. 439, 444–45, 473 A.2d 318 (1984) (analyzing General Statutes § 42-133g, which is not relevant to present case).

A

The first issue on appeal is whether the trial court correctly held that a franchise exists between the parties, pursuant to § 42-133e (b), an integral part of the franchise act. We conclude that it did.

We begin by examining § 42-133e (b), which defines a franchise as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods . . . under a marketing plan or system *prescribed in substantial part* by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is *substantially associated* with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate . . . ." (Emphasis added.)

1

We must decide whether the trial court properly concluded that the plaintiff proved that it had with the defendant, "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods . . . under a marketing plan or system prescribed in substantial part by a franchisor . . . ." General Statutes § 42-133e (b).[18] The plain language of the

---

[18] See footnote 2 of this opinion.

statute creates a broad definition of what agreements and actions the trial court should examine when applying the statute. Moreover, the statute only requires a substantial prescription of a marketing plan or system in order for a plaintiff to meet the first requirement of the definition.

The defendant claims that § 42-133e (b) (1) requires a franchisor to possess an express contractual right to prescribe substantially its franchisee's marketing plan, and that, consequently, the trial court should have considered only the agreement and not the behavior of the parties in the present case.[19] This assertion, however, ignores the broad language of § 42-133e (b) that refers to "an oral or written agreement or arrangement . . . ." The relationship of the parties, pursuant to § 42-133e (b) (1) is not governed solely by the parties' main written agreement. "Rather its legal significance is fixed by reality, not by what defendant[s] or plaintiffs call it, though descriptive language may be relevant." *Petereit v. S.B. Thomas, Inc.*, 853 F. Sup. 55, 60 (D. Conn. 1993), aff'd in part, rev'd in part, 63 F.3d 1169 (2d Cir. 1995), cert. denied, 517 U.S. 1119, 116 S. Ct. 1351, 134 L. Ed. 2d 520 (1996); see also *Chem-Tek, Inc.* v. *General Motors Corp.*, 816 F. Sup. 123, 125 (D. Conn. 1993) (finding agreement between parties based on oral and written representations and a long established course of dealings). Accordingly, the statutory test should be whether the parties' conduct, in addition to their words, constitutes an agreement or arrangement. Any actions constituting an agreement or arrangement, in turn, must be

[19] In addition, the defendant claims that the agreement did not include the right to prescribe substantially the plaintiff's marketing plan or system. Therefore, if the trial court applied the proper test by considering only the agreement, it would not have found substantial prescription. Because we conclude that the trial court's considerations were not limited to the agreement, we decline to reach this subissue.

examined when determining whether a marketing plan or system is substantially prescribed.[20]

In the present case, the parties' actions pursuant to the program constitute an agreement or arrangement pursuant to § 42-133e (b) (1) because it is a structured program, into and from which the defendant formally places and removes its distributors. Moreover, the defendant's arguments notwithstanding, the plaintiff participated in the program, at the insistence of the defendant, from February, 1992, until April, 1995, and again between January, 1996, until April, 1996, two intervals that represent a significant period of time. More importantly, the defendant reserved the right to put the plaintiff on its program when, in its judgment, the

---

[20] The dissent argues that the act's legislative history "strongly suggests that the legislature intended that § 42-133e (b) limit 'franchises' to those situations in which a product supplier retains a contractual right to exercise substantial control over the manner in which the distributor markets the supplier's products to its customers." For example, the dissent points to the change from the proposed requirement of "*a community of interest in the marketing of the goods*"; (emphasis added) Raised Committee Bill No. 5081; to the present language, "*a marketing plan or system prescribed in substantial part by the franchisor.*" (Emphasis added.) General Statutes § 42-133e (b). Although we agree with the dissent that this change is significant, we cannot agree that it signifies that the legislature intended § 42-133e (b) to be limited to situations where "a product supplier retains a *contractual* right to exercise substantial control over" the distributor's marketing plan or system. (Emphasis added.) The change does not relate to a requirement of a contractual right. Our reading of § 42-133e (b) (1) adheres to the present language of the statute, which provides that a " '[f]ranchise' means an *oral or written agreement or arrangement* . . . [that entails] a marketing plan or system prescribed in substantial part by a franchisor . . . ." (Emphasis added.)

Similarly, the dissent leaps from the statutory language stated in the previous paragraph to a requirement of "pervasive *contractual* control," (emphasis in original) supposedly based in part on the legislators comments on the floor of the House of Representatives. The comments the dissent cites, however, do not support such a requirement. See, e.g., 15 H.R. Proc., supra, p. 2780, remarks of Representative Elmer A. Mortensen (bill protects franchises against "one-sided affair[s]"); id., p. 2785, remarks of Representative Howard A. Newman (bill protects distributors terminated for refusing to purchase and distribute supplier's trading stamps to customers).

plaintiff had failed to perform up to the defendant's expectations. Thus, the trial court properly considered the actions of the parties with respect to the program and the fact that the defendant reserved the right to put the plaintiff on the program when the court concluded that the defendant substantially prescribes the plaintiff's marketing plan or system.

The defendant also argues that the trial court's finding that the defendant substantially prescribes the plaintiff's marketing plan was improper because the plaintiff, not the defendant, is responsible for developing and satisfying its own marketing plan and setting its own prices. The defendant further contends that the plaintiff's obligation to maintain competent, trained staff and adequate inventory does not give the defendant control over the plaintiff's marketing plan.

There is no precise formula as to how many or which factors create the level of control indicative of a franchise, pursuant to the franchise act. *Chem-Tek, Inc.* v. *General Motors Corp.*, supra, 816 F. Sup. 129; *Sorisio* v. *Lenox, Inc.*, 701 F. Sup. 950, 960 (D. Conn.), aff'd, 863 F.2d 195 (2d Cir. 1988). Many federal courts have cited the Appellate Session of the Superior Court in *Consumers Petroleum of Connecticut, Inc.* v. *Duhan*, 38 Conn. Sup. 495, 452 A.2d 123 (1982), for its list of factors establishing substantial prescription of a marketing plan or system, pursuant to § 42-133e (b). That court considered whether the franchisor had control over: (1) hours and days of operation; (2) advertising; (3) lighting; (4) employee uniforms; (5) prices; (6) trading stamps; (7) hiring; (8) sales quotas; and (9) management training. Id., 498–99. That court also looked to determine if the franchisor provided the franchisee with financial support, audited its books, or inspected its premises. Although this is a list of relevant factors, it is not definitive, and may be more applicable to certain types of businesses, such as retailers.

Contrary to the arguments of the defendant, we conclude that the trial court correctly considered these factors and that its factual findings were not clearly erroneous. Each of the factors found by the trial court was supported by facts in the record and was an appropriate criterion for determining the first prong of the test to determine whether a franchise exists pursuant to § 42-133e (b).

To begin, the trial court found that, although the plaintiff proposes a business plan, it is subject to the defendant's approval. Once the defendant approves the plan, it becomes the defendant's marketing plan to enforce upon the plaintiff. The defendant also utilizes the program as a tool through which it exercises control over the plaintiff. The agreement directs the plaintiff to prepare a business plan that includes targeted accounts, promotion programs, sales forecasts, a training plan, an inventory plan, and demonstration equipment.[21] Pursuant to the agreement, the defendant constantly monitors the plaintiff's compliance with its business plan and intervenes in its operations by recommending additional sales promotions, suggesting the hiring of specialized employees, and participating in closing sales with the plaintiff's customers whenever the defendant finds the plaintiff's adherence to its business plan inadequate.

Second, the defendant also possesses power over pricing, one of the most significant criteria for determining control. "Price is perhaps the most fundamental aspect of a marketing plan. Where the prices of products are controlled by the [franchisor] and not the [franchisee], such control effectively deprives distributors of

---

[21] In contrast to the claims made by the dissent, the agreement specifically requires the plaintiff to make a business plan with these exact action items. Furthermore, the fact that the defendant requires the plaintiff to create such a detailed plan, subjects the plan to the defendant's approval, then uses the plan as a mechanism with which to oversee the plaintiff, all manifest the defendant's control over the plaintiff's marketing plan.

independent judgment in conducting their business. Thus, the ability to set prices is quite indicative of a franchisor's control." *Petereit* v. *S.B. Thomas, Inc.*, supra, 63 F.3d 1181. The trial court found that the defendant effectively controls the prices that the plaintiff can charge its customers for the defendant's products. See id. (franchisee only had limited discretion as to price because franchisor preprinted prices on goods' packages). According to the trial court, the plaintiff only has limited control over such pricing for many reasons. For example, the defendant instructs the plaintiff on price quotes for the training of customers on the defendant's products and absolutely dictates the prices that the plaintiff can charge when selling to the defendant's national customers. The defendant also publishes a catalog of its products, which the plaintiff, in turn, uses in its sales efforts. This catalog lists a "manufacturer's suggested price" for each item.

The defendant argues that the catalog does not establish prices because the plaintiff could either ask the defendant to sell the products to it for a lower than wholesale price, or sell the product to its customers at a price below the catalog price, and accept the resulting lower profit margin. Such claims, as the trial court found, are illusory because: (1) it is the defendant's decision whether to sell its products to the plaintiff at a reduced price; (2) there is evidence in the record that the defendant has previously chastised the plaintiff for selling the defendant's products at a price lower than the catalog price; and (3) selling the defendant's products below their listed catalog price is not commercially viable because of the resulting reduction in the plaintiff's profit margin.

Third, the trial court found that, although the plaintiff retains the ultimate power to hire and fire its personnel, the defendant possesses some control over this matter as well. Such control was a factor for several federal

courts that have noted explicitly that the franchisee exclusively controlled the hiring and firing of its personnel when finding no substantial prescription of the franchisee's marketing plan or system. See, e.g., *Ackley* v. *Gulf Oil Corp.*, 726 F. Sup. 353, 366 (D. Conn.), aff'd, 889 F.2d 1280 (2d Cir. 1989), cert. denied, 494 U.S. 1081, 110 S. Ct. 1811, 108 L. Ed. 2d 941 (1990); *Sorisio* v. *Lenox, Inc.*, supra, 701 F. Sup. 960; *Aurigemma* v. *Arco Petroleum Products Co.*, 698 F. Sup. 1035, 1039 (D. Conn. 1988); cf. *Carlos* v. *Philips Business Systems, Inc.*, 556 F. Sup. 769, 777 (E.D.N.Y.), aff'd, 742 F.2d 1432 (2d Cir. 1983) (power to hire and fire franchisee's personnel is factor when finding franchise relationship pursuant to franchise act).

In the present case, the trial court found that the pressure that the defendant exerts on the plaintiff to make certain personnel decisions, particularly while the plaintiff is participating in the program, which perpetually carries an implied threat of termination, amounts to the control that underlies a franchise relationship. The agreement requires the plaintiff to maintain competent sales and marketing personnel who are specifically trained to sell the defendant's products. The record also supports the finding that the defendant "exerted enormous pressure" on the plaintiff to hire specialists for its products, and sales and operations managers. For example, at one point, the defendant required the plaintiff to hire a specialist in motion control products before it could sell such devices. The defendant also has urged the plaintiff to terminate certain employees. Moreover, in 1992, one of the reasons the defendant cited for placing the plaintiff on the program was its failure to maintain adequate sales personnel. In addition, in 1996, the defendant listed the plaintiff's failure to replace its operations manager as a reason for placing it on the program again.

Fourth, pursuant to the agreement, the defendant demands extensive training of the plaintiff's personnel regarding the defendant's products. Several federal district courts have found the franchisor's right to require training of the franchisee's staff to be significant when determining whether the franchisor substantially prescribes franchisee's marketing plan or system. See, e.g., *Hydro Air of Connecticut, Inc.* v. *Versa Technologies, Inc.*, 599 F. Sup. 1119, 1124 (D. Conn. 1984); *Carlos* v. *Philips Business Systems, Inc.*, supra, 556 F. Sup. 777. In the present case, the agreement provides in relevant part that "distributors are expected to participate in training conducted locally at the factory and in regional locations." The agreement further requires the plaintiff to authorize its personnel to attend training at specific schools in cooperation with the defendant. The defendant insists on frequent, intensive training of the plaintiff's sales and technical employees, which it often provides itself. In addition, the defendant has censured the plaintiff for not sending personnel to training sessions. Furthermore, the defendant requires the plaintiff to maintain and utilize a training center, at the plaintiff's expense, for the plaintiff's staff and customers.

Fifth, the trial court further found that the defendant exerts significant control over the plaintiff's inventory. See, e.g., *Aurigemma* v. *Arco Petroleum Products Co.*, supra, 698 F. Sup. 1040 (examined franchisor's control over franchisee's inventory when determining whether franchisor substantially prescribes franchisee's marketing plan or system); *Carlos* v. *Philips Business Systems, Inc.*, supra, 556 F. Sup. 777 (same). The trial court also found that the defendant carefully monitors the plaintiff's inventory, including placing pressure on it to keep more of the defendant's products on its shelves. The agreement also requires the plaintiff to maintain certain inventory of the defendant's products, dictates minimum purchase amounts of certain products, and

grants the defendant's local office permission to require the exact level and mix of inventory or, in the alternative, allows the defendant's area manager and the plaintiff to make an inventory agreement. According to the agreement, the plaintiff must also provide the defendant with inventory reports on the twentieth day of each month. Although the defendant does not completely dictate the plaintiff's level of inventory of all the defendant's products, the defendant exercises substantial control over the plaintiff's inventory.

Sixth, the trial court found that the agreement provides that the defendant holds the right to examine the plaintiff's financial records and to require audits. Several federal court decisions also have considered this factor when determining whether a franchisor substantially prescribes its franchisee's marketing plan or system. See, e.g., *Ackley* v. *Gulf Oil Corp.*, supra, 726 F. Sup. 365–66; *Sorisio* v. *Lenox, Inc.*, supra, 701 F. Sup. 960; *Aurigemma* v. *Arco Petroleum Products Co.*, supra, 698 F. Sup. 1040. In the present case, the agreement requires the plaintiff to maintain sales records of the defendant's products and business records "reflecting the true financial condition and operating records of [the plaintiff's] business." The agreement also grants the defendant the right to examine and copy said records. Moreover, the defendant periodically requires the plaintiff to submit audited financial reports.

In addition, the trial court found that the defendant uses the program to threaten distributors with termination and to subject them to its dictates of operation. More specifically, the defendant utilizes the program as a mechanism to dictate virtually every aspect of the plaintiff's operations. Through the program, the defendant provides distributors with sales and marketing

support, regularly monitors their activities, and constantly pressures them to increase their sales. For example, the defendant periodically sends the plaintiff an " 'action list' " detailing tasks to be undertaken by a specific employee by a specific date, such as " 'categorize accounts by size,' " " 'analyze lo-tech sales territories,' " and " 'place branch inventory with [the defendant].' " The defendant then monitors the plaintiff's compliance with the program by tracking its percentages of completion of specific action list items. According to the program, among its many other obligations, the plaintiff was to prepare a twelve month business plan that was to be reviewed by the defendant, and to participate in joint meetings in order to address problem areas.

The defendant maintains, however, that it does not control the plaintiff's marketing plan because the plaintiff unequivocally rejected the defendant's assistance in the April 26, 1996 letter.[22] Based on that letter, however, the trial court found that the program's mandatory nature was proven by the fact that the defendant terminated the parties' agreement as soon as the plaintiff stated that it would not participate in it again.

In light of all of the above evidence, the trial court's determination that the defendant substantially prescribes the plaintiff's marketing plan, pursuant to § 42-133e (b) (1)—the first statutory prerequisite for determining whether a franchise existed—is legally and logically correct and factually supported by the evidence in the record. Indeed, we find the evidence overwhelming to support the trial court's finding that the defendant prescribed in substantial part the plaintiff's marketing plan. We note, however, that although the trial court reasonably found numerous ways in which the defendant controls the plaintiff's marketing in the

---

[22] See the introductory section of this opinion.

present case, there is no one factor, or single combination of factors, required in order to constitute the control required under § 42-133e (b) (1). *Petereit* v. *S.B. Thomas, Inc.*, supra, 63 F.3d 1180 ("[t]here is no precise formula as to how many of these factors must be present to find the level of control indicative of a franchise"); see also *Consumers Petroleum of Connecticut, Inc.* v. *Duhan*, supra, 38 Conn. Sup. 498–99 (listing relevant factors).

2

The trial court also concluded that the plaintiff proved the second statutory requirement for establishing a franchise—that is, that the franchisee is substantially associated with the franchisor's trademark, trade name or other commercial name or symbol. We conclude that the trial court's determination is supported by the evidence.

The defendant claims that "substantially associated" pursuant to § 42-133e (b) (2) means franchisees that either have no separate identity or are dependent on a single supplier.[23] Again, the defendant ignores the plain language § 42-133e (b) (2), which requires that "the operation of the franchisee's business pursuant to such

---

[23] The defendant's reliance on our decision in *Muha* v. *United Oil Co.*, supra, 180 Conn. 726, is misplaced. In that case, this court held that the trial court properly concluded that the retailer's business was not substantially associated with any type of trademark, trade name or other commercial name or symbol. The trial court had found that the defendant wholesaler did not have a trademark, trade name or other commercial name or symbol and that, even though the plaintiff retailer did have a limited contract right to use the trademark of the wholesaler's supplier, the wholesaler was not an affiliate of the supplier, but, rather, an independent entity. Therefore, any association between the retailer and the wholesaler's supplier would not satisfy the statute with respect to the wholesaler and the retailer. See General Statutes § 42-133e (b) (2) ("operation of franchisee's business . . . is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor *or its affiliate*" [emphasis added]).

plan or system is *substantially associated* with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate . . . ." (Emphasis added.) The statute does not require exclusivity or complete association.[24] Instead, the word "substantially" depicts the level of association required in order to create a franchise. *Chem-Tek, Inc.* v. *General Motors Corp.*, supra, 816 F. Sup. 129 ("[t]he requirement that the conduct of the franchisee's business be substantially associated with the franchisor's trademark does not require exclusivity"); *Hydro Air of Connecticut, Inc.* v.

---

[24] Without any basis in the statutory language, the dissent attempts to show that the level of association required by § 42-133e (b) is one in which the distributor is virtually synonymous with its supplier. Moreover, in support of such arguments, the dissent misinterprets Representative Nicholas A. Lenge's remarks on the floor of the House of Representatives. The dissent claims that Representative Lenge "stated that the proposed legislation would not apply to an agreement by which a manufacturer grants an independent hardware store an exclusive right to sell the manufacturer's products in the hardware store." Actually, Representative Lenge, speaking in support of the proposed legislation, which at that point in time only required specific notice provisions, without good cause requirement for cancellation, stated: "I support the [proposed legislation] . . . because it does aim at and achieves one simple thing. It says that it does not undo any of the contract arrangements, all it does is provide a lead time in the event of termination, whether the termination is for conviction of a crime, whether it is because of poor management or for any other reason. . . . It relates to a system that we understand. It is not undoing a long-standing situation of Fanny Farmer candies or some other item in the hardware store or anything else." 15 H.R. Proc., supra, p. 2793. Thus, according to Representative Lenge, the bill did apply to such hardware store items, but it did not reek havoc upon the already established relationships between franchisees and franchisors because the proposed legislation only required notice and lead time before termination of a franchise. Moreover, just prior to Lenge's comments, Representative Robert D. King, speaking in opposition to the proposed legislation, stated that it would apply to a hardware store's right to sell particular products. Id., p. 2792. We note that the undoing of specific contract arrangements did occur, however, when the legislation added a "good cause" requirement in order to terminate a franchise pursuant to § 42-133f. See Public Acts 1973, No. 73-500, § 2; Public Acts 1974, No. 74-292, § 1.

*Versa Technologies, Inc.*, supra, 599 F. Sup. 1125 (§ 42-133e [b] [2] "does not require the plaintiff's entire business to be so associated").[25]

In addition, the plain meaning of "substantially" does not support the defendant's arguments. Black's Law Dictionary (6th Ed. 1990) defines "substantially" as "[e]ssentially; without material qualification; in the main . . . in a substantial manner." Likewise, "substantial" is defined as, "[o]f real worth and importance; of considerable value; valuable. Belonging to substance; actually existing; real; not seeming or imaginary; not illusive; solid; true; veritable. . . . Synonymous with material." (Citations omitted.) Id. Thus, the requirement of a "substantial" association creates a threshold far below the exclusive or complete association argued by the defendant.[26]

We next examine the trial court's conclusion in more detail. The trial court's determination was based on the fact that, pursuant to the agreement: (1) the plaintiff

[25] In contrast, the dissent contends that *Muha* v. *United Oil Co.*, supra, 180 Conn. 726, suggests that a seller must be contractually required to sell only the supplier's products in order for a franchise to exist pursuant to § 42-133e (b). The dicta to which the dissent refers, however, does not merit such a constricted reading. See id. Moreover, the United States Court of Appeals for the Second Circuit and, thereafter, several decisions of the United States District Court for the District of Connecticut, have refused to read *Muha* as requiring exclusivity. See *Grand Light & Supply Co.* v. *Honeywell, Inc.*, 771 F.2d 672, 678 (2d Cir. 1985) ("we take it as a clear indication that while the state's highest court might not require that the entire business be associated with the franchisor's trademark, it would at least insist that more than three percent of the franchisee's business be involved"); see also, e.g., *Hydro Air of Connecticut, Inc.* v. *Versa Technologies, Inc.*, supra, 599 F. Sup. 1125 ("[Section 42-133e (b) (2)] does not require the plaintiff's entire business to be so associated. Indeed, the court can find no reason to exclude from the operation of the statute a business that acts as a franchisee for several franchisors."); *Sorisio* v. *Lenox, Inc.*, supra, 701 F. Sup. 961 ("[i]n *Grand Light [& Supply Co.]*, the Second Circuit stated the exclusivity is not required under the Act").

[26] Moreover, the legislative history described in part I of this opinion does not contradict our reading of the statute.

distributes the defendant's catalogues and promotional materials containing the defendant's logo; (2) the flyers used by the plaintiff contain the defendant's logo; and (3) the plaintiff prominently displays a sign containing the defendant's name on the plaintiff's premises.[27] See *Chem-Tek, Inc.* v. *General Motors Corp.*, supra, 816 F. Sup. 129 (franchisee's identification as General Motors product representative and placement of General Motors trademark and logotypes on its letterhead and business cards examined when determining substantial association). The agreement specifically requires the defendant to make "available promotional materials to support the [plaintiff]." It also mandates that the plaintiff "[p]rominently [display] the current 'Appointed Distributor' sign . . . ."

For fifty years, the plaintiff widely has been recognized as the leading distributor of the defendant's products in Connecticut, causing customers in the trade to think of the parties as "one and the same" identity. See generally *Cooper Distributing Co.* v. *Amana Refrigeration, Inc.*, 63 F. 3d 262, 271 (3d Cir. 1995) (considering intangible aspects of parties' relationship, such as nontransferable goodwill and customers' association of parties as " 'one in the same,' " when examining whether parties' relationship constitutes franchise pursuant to New Jersey statute). Some federal courts have looked at the likely result of a disassociation of the parties in order to determine how dependent, or associated, the franchisee is on its franchisor and its commercial symbols. See, e.g., *Sorisio* v. *Lenox, Inc.*, supra, 701 F. Sup. 961. "Where the franchisee is completely dependent on the public's confidence in the franchised product for

[27] Hence, although the dissent correctly points out that the agreement requires the plaintiff to receive express approval before using the defendant's trademark, that does not mean that the plaintiff never uses the defendant's trademark. On the contrary, as the trial court properly found, pursuant to the agreement, the plaintiff indeed utilizes the defendant's trademark in the three aforementioned manners.

most or all of [its] business, abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination." *Grand Light & Supply Co.* v. *Honeywell, Inc.*, 771 F.2d 672, 677 (2d Cir. 1985) (finding no substantial association where no such dependence existed). In the present case, termination of the parties' agreement would result in the plaintiff losing one half of its gross annual sales of $20 million, as well as the opportunity to distribute many products, such as wires, that it presently sells as complements to the defendant's products. Furthermore, the trial court found that such an action would cause the plaintiff's entire business to fail.

In sum, both the percentage of the plaintiff's sales of the defendant's products and the plaintiff's use of the defendant's name, logo, and trademark in making those sales are substantial. This is true, even though the plaintiff retains the right to, and does, sell products other than those of the defendant. Consequently, we conclude that the trial court properly found that the plaintiff's business, pursuant to the agreement, was substantially associated with the defendant's trademark, service mark, trade name, logotype, advertising or other commercial symbol. General Statutes § 42-133e (b) (2).

B

We now must determine whether the trial court properly concluded that the defendant failed to prove that it had "good cause," pursuant to § 42-133f (a), to terminate its agreement with the plaintiff. Again, we conclude that the trial court's finding is supported by the evidence.

The franchisor has the burden of proving "good cause" to terminate the franchise, even if the franchisee is the plaintiff, as in the present action. *Petereit* v. *S.B. Thomas, Inc.*, supra, 63 F.3d 1185; see generally *Kealey Pharmacy* v. *Walgreen Co.*, 761 F.2d 345, 350 (7th Cir.

1985) (applying Wisconsin statute). Furthermore, a trial court, as it did in the present case, must apply an objective standard when determining whether the defendant had good cause to terminate an agreement, pursuant to § 42-133f (a). See *Darling* v. *Mobil Oil Corp.*, 864 F.2d 981, 991 (2d Cir. 1989) (employing objective standard when determining whether franchisee complied with "reasonable" franchise provision); accord *McKee* v. *Harris*, 649 F.2d 927, 932 (2d Cir. 1981), cert. denied, 456 U.S. 917, 102 S. Ct. 1773, 72 L. Ed. 2d 177 (1982); *Slifkin* v. *Condec Corp.*, 13 Conn. App. 538, 549, 538 A.2d 231 (1988).

Therefore, we must determine whether the trial court properly concluded that the defendant objectively failed to prove "good cause," pursuant to § 42-133f (a). On appeal, the defendant claims that the trial court's finding that the plaintiff complied substantially with essential provisions of the agreement is clearly erroneous. More specifically, the defendant claims that the trial court should have examined: (1) the plaintiff's experience on the program; and (2) the plaintiff's failure to comply substantially with the agreement's requirement to satisfy "the written marketing commitments established in the annual business plan as well as mutually established sales goals established annually."

First, we look to the relevant language of the statute. Section 42-133f (a) provides in relevant part that no franchisor shall terminate or fail to renew a franchisee "except for good cause which *shall include, but not be limited to* the franchisee's refusal or failure to *comply substantially* with any material and reasonable obligation of the franchise agreement . . . ." (Emphasis added.) It is a well established principle of statutory construction that "general terms will be construed to embrace things of the same general kind or character as those specifically enumerated." (Internal quotation

marks omitted.) *Paige* v. *Town Plan & Zoning Commission*, 235 Conn. 448, 457–58, 668 A.2d 340 (1995). Consequently, in order to prove "good cause," a franchisor would have to show that the franchisee either failed to or refused to comply substantially with a material and reasonable term of the franchise agreement, or that the franchisor had an equivalent business reason of a similar nature.

The legislative history of the franchise act supports our reading. As explained earlier, the legislature originally passed the franchise act in order to address a particular problem that had arisen with local gasoline dealerships. When adopted in 1972, the franchise act simply provided that a franchise could not be terminated without giving the franchisee sixty days written notice. Public Acts 1972, No. 287, § 1. According to the debates in the House of Representatives, in order to protect against arbitrary and abusive terminations, in 1973 the legislature amended § 42-133f (a) to add a good cause termination requirement, *without* the qualifying phrase presently in the statute, "which shall include, but not be limited to . . . ." Public Acts 1973, No. 73-500. Representative Daniel W. Brunski described the harm the 1973 amendment was designed to prevent: "The franchise garage operators in our state live in constant jeopardy. They live in fear of being put out of business on merely the whim of the large oil companies." 16 H.R. Proc., Pt. 14, 1973 Sess., p. 6974.

Once the 1973 amendment was adopted, however, many oil and gasoline franchisors threatened to leave the state because they felt that the amendment made § 42-133f too favorable to franchisees. Conn. Joint Standing Committee Hearings, General Law, 1973–74 Sess., pp. 270–75. The franchisors specifically addressed two concerns regarding § 42-133f (a) after the 1973 amendment: (1) that it unreasonably curtailed their freedom to manage their real estate investments;

and (2) that it unduly limited their ability to terminate franchisees whose performance was substandard or unprofitable. Consequently, in 1974, the legislature once again amended § 42-133f (a),[28] adding the present language "shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement . . . ." Public Acts 1974, No. 74-292, § 1. According to Representative Howard A. Newman, the legislature's objective in adding "shall include, but not be limited to" was "to protect our Connecticut dealers from franchise cancellations and at the same time not drive the oil companies out of our state." 17 H.R. Proc., Pt. 10, 1974 Sess., p. 4926.

We agree with the defendant that the court in *Petereit* v. *S.B. Thomas, Inc.*, supra, 63 F.3d 1184, was correct when it observed: "If the Connecticut legislature intended good cause to result only from franchisee breach, it failed to use language expressing such a policy decision. . . . In effect, the amendments were the Connecticut legislature's acknowledgment that franchisors' economic interests must be accounted for in striking a balance between franchisee protection and attracting and retaining franchisors to do business in the state." In *Petereit*, the United States Court of Appeals for the Second Circuit held that the franchisor's good faith, legitimate business decision, based upon grounds independent from the actions of the franchisees, constituted "good cause" pursuant to § 42-133f (a). Id., 1185. The defendant in that case wanted to terminate its franchise agreements so that it could reallocate the exclusive territories of its franchisees and thereby increase its profits. Id. We do not agree with the defendant, however, that, according to the *Petereit*

---

[28] Also, in 1975, the legislature added subsection (e) to § 42-133f, which allows a franchisor to elect not to renew a contract under certain circumstances. Public Acts 1975, No. 75-360, § 1.

decision, the trial court in the present case incorrectly found that the defendant failed to prove that it had good cause to terminate the agreement with the plaintiff. In the present case, the defendant listed six reasons to support its termination of the agreement, all of which were based on the plaintiff's performance, unlike the situation in *Petereit*.

The defendant's June 27, 1996 letter listed the following grounds for its intent to terminate: (1) the defendant's disappointing four year experience with the plaintiff under the program; (2) the plaintiff's lack of a stable, knowledgeable and experienced management team to market and sell the defendant's products; (3) the plaintiff's failure to train adequately its employees regarding the defendant's products and procedures, and its lack of committed product specialists; (4) the plaintiff's poor market share and sales of the defendant's products; (5) an inadequate commitment to and participation in the defendant's product promotion programs; and (6) a lack of a cooperative working relationship that had developed into the " 'recalcitrant and sometimes belligerent attitude' " of the plaintiff.[29]

Notwithstanding the defendant's list of reasons for termination, we conclude that, based on the trial court's findings, the trial court properly found that the defendant did not prove "good cause" pursuant to § 42-133f (a). To begin, contrary to the assertions of the defendant, the trial court did analyze the plaintiff's sales performance during the time periods in which it was participating in the program. For example, the court properly found that the plaintiff complied with the agreement's requirement to "vigorously and aggressively promote and develop the market for the sale of

---

[29] In the defendant's appellate brief, it concedes that "[the plaintiff] was not terminated for its failure to remain on the . . . [p]rogram . . . ." Therefore, the dissent's claim regarding the possibility that the plaintiff's failure to participate in the program constituted "good cause" is without merit.

[the defendant's] [p]roducts . . . ." Between 1990 and 1995, the plaintiff's sales of the defendant's products produced a zero net growth when the rise of the prices that the defendant charged the plaintiff are taken into account. The trial court found, however, that the evidence demonstrated that from 1990 to 1993, the Connecticut economy was depressed and that the defendant failed to show adequately how the plaintiff's performance compared to similar distributors or to the defendant's regional or national growth during the same time period. Evidence at trial also demonstrated a 20.6 percent growth in the plaintiff's sales of the defendant's products in the 1994 fiscal year and another 22.5 percent growth the next fiscal year, thereby exceeding the defendant's national growth in the 1995 fiscal year by 3.5 percent. Moreover, the defendant, by letter dated February 10, 1997, commended the plaintiff because it was one of twenty-one distributors to buy more than $10 million worth of the defendant's products during the 1996 fiscal year. Even though the plaintiff's sales declined 13.5 percent from October, 1995, to April, 1996, the trial court reasonably found that this constituted too short of a time period from which the plaintiff's overall sales performance could be evaluated.

In addition, the trial court properly found that the plaintiff complied with the agreement's requirement to maintain a staff of competent sales and marketing personnel trained to describe, demonstrate and quote the defendant's product lines. According to the trial court, the plaintiff both hired the required specialists and replaced those who left as promptly as it could. For example, virtually as soon as Fadden and Lusk left the plaintiff's employ, the plaintiff undertook sustained efforts to refill those positions.

Finally, we disagree with the defendant's argument that the judgment of the trial court should be reversed because the plaintiff failed to comply substantially with

the agreement's requirement to satisfy "the written marketing commitments established in the annual business plan as well as mutually established sales goals established annually." The February 10, 1997 letter, which congratulated the plaintiff for its high level of purchases of the defendant's products in the 1996 fiscal year, belies the defendant's claim. On the basis of this letter and the factual findings regarding the plaintiff's recent history of successful sales of the defendant's products, we conclude that there was substantial evidence to support the trial court's finding that the defendant did not prove it had good cause to terminate the parties' agreement.

## II

The final issue on appeal is whether the trial court properly held that the defendant's attempted termination of the agreement violated General Statutes § 42-110b (a) of CUTPA. We conclude that it did and, consequently, affirm the judgment of the trial court.

To the extent that the defendant is challenging the trial court's interpretation of CUTPA, our review is plenary. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 26. As stated previously in part I of this opinion, however, we review the trial court's factual findings under a clearly erroneous standard. *Poulos* v. *Pfizer, Inc.*, supra, 244 Conn. 616. Appellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. *Jaworski* v. *Kiernan*, supra, 241 Conn. 405.

Section 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "It is well settled that in determining whether a practice violates CUTPA we have adopted

the criteria set out in the 'cigarette rule'[30] by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 43. Moreover, this court has set forth a three part test for satisfying the substantial injury criterion: "[1] [the injury] must be substantial; [2] it must not be out-weighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided." (Internal quotation marks omitted.) *Web Press Services Corp.* v. *New London Motors, Inc.*, 205 Conn. 479, 484, 533 A.2d 1211 (1987).

The trial court determined that the plaintiff had proven the first and third criteria of the "cigarette" rule. According to the trial court, the defendant's conduct in attempting to terminate the plaintiff's franchise without good cause is a practice that offends the public policy of Connecticut to promote fairness among businesses behind the franchise act. See, e.g., *Chem-Tek, Inc.* v. *Ford Motor Corp.*, supra, 816 F. Sup. 131 (denying

---

[30] See *Federal Trade Commission* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972).

motion to dismiss CUTPA violation claim based on violation of franchise act); *Tillquist* v. *Ford Motor Credit Co.*, 714 F. Sup. 607, 616 (D. Conn. 1989) (finding CUTPA violation where defendant violated banking regulations). In addition, the trial court found that the third criterion, a substantial injury to consumers, competitors or other businesspersons, is met because termination of the agreement would force the plaintiff to go out of business.

The defendant's argument that a CUTPA violation could not be sustained based solely on the trial court's finding that the plaintiff's business would fail if the franchise were terminated, is refuted because the trial court found that both the first *and* the third elements of the "cigarette rule" were met. Moreover, we do not deem clearly erroneous the trial court's finding that such a termination would put the plaintiff out of business. Our established jurisprudence, which demonstrates that one element alone can be the basis of a CUTPA violation, also discredits such an argument. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 43 ("All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." [Internal quotation marks omitted.]). Lastly, our well settled jurisprudence in this area, which states that CUTPA violations do not necessarily have to be based on an underlying actionable wrong, defeats the defendant's argument that it did not violate § 42-133f, and that, therefore, there can be no CUTPA violation. Id. Nevertheless, this argument is moot because we affirm the trial court's determination of a violation of § 42-133f (a).

On these bases, we hold that the trial court properly concluded that the plaintiff proved the first and third

elements of the "cigarette rule," and that, therefore, the defendant violated CUTPA.

## III

In conclusion, we hold that the trial court properly determined that the parties have a franchise relationship pursuant to § 42-133e (b). We further hold that the court properly concluded that the defendant violated § 42-133f (a) and § 42-110b (a) of CUTPA when it attempted to terminate the parties' franchise agreement.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

CALLAHAN, C. J., dissenting. I disagree with the majority's conclusion that the relationship between the plaintiff, Hartford Electrical Supply Company, and the defendant, Allen-Bradley Company, LLC,[1] constitutes a "franchise" within the meaning of General Statutes § 42-133e (b).[2] I therefore respectfully dissent.

The following undisputed facts are relevant to this appeal. The defendant is a manufacturer of sophisticated industrial automation products. The plaintiff, a distributor of electrical supplies and equipment, is an authorized distributor of the defendant's products. The

---

[1] Allen-Bradley Company, LLC, which was substituted for Allen-Bradley Company, Inc., is the only defendant for purposes of the present appeal, and references to the defendant are to Allen-Bradley Company, LLC. See footnotes 1 and 10 of the majority opinion.

[2] General Statutes § 42-133e provides in relevant part: "(b) 'Franchise' means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of . . . distributing goods . . . under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor . . . ."

plaintiff distributes the products of other manufacturers and derives only approximately one half of its sales from distribution of the defendant's products.

The relationship between the plaintiff and the defendant is governed by a written *distributorship* agreement (agreement). The agreement, which was executed in 1991, grants to the plaintiff the right to sell certain of the defendant's products. The agreement assigns to the plaintiff a marketing area and requires, inter alia, that the plaintiff: (1) "devote its best efforts to developing the sales potential" of its assigned market area; (2) "vigorously and aggressively promote and develop the market for the sale of [the defendant's products]"; (3) maintain "a staff of competent sales and marketing personnel who are trained to describe, demonstrate and quote [the defendant's products]" ; (4) authorize its personnel to attend training when recommended by the defendant; (5) comply with certain inventory requirements; (6) purchase demonstration equipment for certain of the defendant's products; (7) prominently display the defendant's "Appointed Distributor" sign; (8) refrain from using the defendant's trademark in its company name; (9) refrain from otherwise using the defendant's trademark without the defendant's express written approval; (10) render prompt courteous service; (11) maintain and make available to the defendant records reflecting the plaintiff's true financial condition; (12) develop an annual business plan for each product line that the agreement authorizes the plaintiff to distribute; (13) satisfy written marketing commitments established in those annual business plans; and (14) satisfy mutually established sales goals.

In addition, the agreement requires that the defendant cooperate with the plaintiff in promoting the marketing and sale of the defendant's products whenever such assistance becomes necessary or desirable. Specifically, the agreement provides that, as necessary or

desirable, the defendant will: (1) make training available to the plaintiff's personnel; (2) provide joint sales assistance and inventory management support; and (3) make promotional material available to the plaintiff. The agreement does not expressly require that the plaintiff accept such assistance from the defendant.

Further, the agreement provides that "either party may terminate the [a]greement at any time, with cause or without any cause whatsoever" on ninety days notice, and that the plaintiff's "sales performance . . . shall be the prime consideration for the continued right hereunder to purchase and sell the [the defendant's] [p]roducts."

In February, 1992, after the plaintiff had experienced two years of weak sales, the defendant placed the plaintiff on its distributor concern program (concern program). The concern program is a remedial program that the defendant offers to distributors who have not met their sales goals. Distributors are identified as early as possible, and support is offered from the defendant's sales and marketing departments to help the distributor to improve its sales performance to meet its goals. The plaintiff monitors the performance of distributors who have been placed on the concern program and pressures them to increase their sales performance.

The defendant informed the plaintiff that it had placed the plaintiff in its concern program because of inadequate: (1) sales performance; (2) sales promotion; (3) staffing; (4) training; and (5) effort to identify new business. The defendant also informed the plaintiff that it had entered the plaintiff into the concern program "with the sincere intent to turn the situation around" and that "the commitment [to do so] must be strong at both organizations . . . ."

Upon placing the plaintiff in the concern program, the defendant notified the plaintiff that: (1) the plaintiff

should prepare a twelve month business plan for the defendant's review; (2) thereafter, a management team would visit the plaintiff to discuss the plaintiff's status; (3) joint meetings then would be scheduled to address problem areas; and (4) unsatisfactory performance in the concern program could result in termination of the plaintiff's distributorship.

Subsequent to the plaintiff's participation in the concern program, its performance improved. Between October 1, 1993, and September 30, 1994, the plaintiff's purchases of the defendant's products increased by 20.6 percent over the previous fiscal year. In April, 1995, the plaintiff presented to the defendant a business plan that it had developed regarding sales of the defendant's products for fiscal year 1996 (1996 business plan). On the basis of the plaintiff's 1996 business plan, the defendant removed the plaintiff from its concern program.

Although the plaintiff's purchases of the defendant's products between October 1, 1994, and September 30, 1995, reflected a 22.5 percent increase over its purchases during the previous year, the plaintiff's *sales* of the defendant's products decreased between April, 1995, and December, 1995. On January 22, 1996, the defendant again placed the plaintiff on the concern program, citing, inter alia, inadequate staffing and training of sales personnel, the departure of the plaintiff's director of operations, concern about internal conflicts within the plaintiff's management, and concern that the plaintiff's 1996 business plan was not being implemented effectively. In response, that plaintiff acknowledged that its 1996 business plan "had temporarily fallen off the tracks."

In April, 1996, however, the plaintiff informed the defendant that it would no longer participate in the

concern program,[3] and on June 27, 1996, the defendant notified the plaintiff that it intended to terminate the plaintiff's distributorship on September 30, 1996. Additional facts will be set forth as necessary.

On July 2, 1996, the plaintiff commenced the present action against the defendant claiming, inter alia, that: (1) its relationship with the defendant constituted a "franchise" within the meaning of § 42-133e (b); (2) the defendant had lacked good cause to terminate the plaintiff's franchise; (3) the defendant's termination of the plaintiff's franchise without good cause was in violation of General Statutes § 42-133f (a)[4] of the Connecticut Franchise Act; (4) the defendant's termination of the plaintiff's franchise without good cause was in violation of General Statutes § 42-110b (a)[5] of the Connecticut Unfair Trade Practices Act. In its complaint, the plaintiff sought both an order enjoining the defendant from terminating its alleged franchise and damages.

The trial court granted a temporary injunction prohibiting the defendant from terminating its relationship with the plaintiff. Thereafter, the parties agreed to expedite discovery and proceed to trial with respect to the plaintiff's claims that the defendant had terminated its relationship with the plaintiff in violation of §§ 42-133f (a) and 42-110b. The court concluded, inter alia, that: (1) the parties' relationship was a franchise within the

[3] In its letter informing the defendant that it no longer would participate in the concern program, the plaintiff stated: "[E]nough is enough. We are not going to let you . . . push us around anymore. . . . Forget remediation and your probationary threats . . . ."

[4] General Statutes § 42-133f (a) provides in relevant part: "No franchisor shall . . . terminate . . . a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement . . . ."

[5] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

meaning of § 42-133e (b); (2) the defendant had terminated that franchise without good cause in violation of § 42-133f (a); and (3) because the defendant's termination of the plaintiff's franchise in violation of § 42-133f (a) offended public policy, it constituted an unfair trade practice within the meaning of § 42-110b. The court, therefore, issued an order enjoining the defendant from terminating its franchise relationship with the plaintiff.

The defendant then moved, pursuant to Practice Book § 61-4 (a), for permission to appeal from that partial judgment of the trial court to the Appellate Court. Upon the granting of its motions for permission to appeal, the defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the defendant claims, inter alia, that the trial court improperly determined that the parties' relationship constituted a "franchise" within the meaning of § 42-133e (b). I agree.

"In construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 195, 708 A.2d 1371 (1998).

Section § 42-133e provides in relevant part: "(b) 'Franchise' means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of . . . distributing goods . . .

under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark . . . ." Thus, in the present case, in order to establish that its distributorship constituted a "franchise" the plaintiff was required to demonstrate: (1) the existence of an "agreement or arrangement" granting the plaintiff the right to distribute the defendant's products "under a marketing plan or system prescribed in substantial part [by the defendant]"; and (2) that the operation of the plaintiff's business pursuant to that marketing plan or system was "substantially associated" with the defendant's trademark. I would conclude that, as a matter of law, the plaintiff did not meet its burden of proof with respect to either of those requirements.

I

I begin with the "marketing plan or system" requirement set forth in § 42-133e (b). By its terms, § 42-133e (b) requires that, in order for a distributorship to constitute a "franchise," the right granted to the distributor by the "agreement or arrangement" must be subject to a "marketing plan or system prescribed in substantial part" by the product supplier. The language of § 42-133e (b) therefore manifests an intent to limit "franchises" to situations in which: (1) the product supplier retains a *contractual* right; (2) to exercise substantial *control* over the manner in which the distributor *markets* the supplier's products to its customers.

A

The legislative genealogy of House Bill No. 5081, the bill that eventually was enacted as Public Acts 1972, No. 287 and codified as the Connecticut Franchise Act; see General Statutes §§ 42-133e through 42-133h; also indicates that the legislature intended that § 42-133e (b)

apply only to agreements or arrangements that provide the product supplier with a *contractual right* to exercise substantial control over the manner in which the distributor markets the supplier's products to its customers. The original version of House Bill No. 5081 provides in relevant part: " '[F]ranchise' means an oral or written agreement or arrangement . . . in which (1) a person grants to another person a license to use a trade name, service mark, or related characteristics; (2) *there is a community of interest in the marketing of goods*; (3) the franchisee as an independent business organization constitutes a component of the franchisor's distribution system; (4) the operation of the franchisee's business is substantially dependent on the franchisor for the continued supply of goods or services . . . ." (Emphasis added.) Raised Committee Bill No. 5081. The legislature's deletion of the language requiring a "community of interest in the marketing of the goods" and its substitution of the language requiring that the "agreement or arrangement" grant to the franchisee the right to distribute the franchisor's products "*under* a marketing plan or system *prescribed* in substantial part by a franchisor"; (emphasis added) General Statutes § 42-133e (b); strongly suggests that the legislature intended that § 42-133e (b) limit "franchises" to those situations in which a product supplier retains a contractual right to exercise substantial control over the manner in which the distributor markets the supplier's products to its customers.

Furthermore, the legislative history of House Bill No. 5081 also indicates that the legislature intended that § 42-133e (b) limit "franchises" to situations in which the product supplier retains a contractual right to exercise substantial control over the manner in which a distributor markets the supplier's products. In the discussion of the bill on the floor of the House of Representatives, Representative Joseph M. Pugliese, explaining

the need for the proposed legislation, stated: "I think there [are] just entirely too many gas station operators being forced out of business by the *type of contracts* they . . . find themselves involved in." (Emphasis added.) 15 H.R. Proc., Pt. 7, 1972 Sess., p. 2783. Representative Elmer A. Mortensen, similarly noting the need for the bill, stated: "It is something terrible to read one of these *leases* and see the fine print in there." (Emphasis added.) Id., p. 2781. Representative Nicholas A. Lenge explained that the bill "does not undo any of the *contract arrangements* . . . ." (Emphasis added.) Id., p. 2793. Finally, Representative Albert R. Webber, a proponent of the bill, noted that in developing the bill, the legislators had reviewed "almost every conceivable *franchise contract* . . . ." (Emphasis added.) Id., p. 2794. I would conclude, therefore, that § 42-133e (b) was intended to limit "franchises" to situations in which the franchisor retains a *contractual right* to exercise substantial control over the manner in which its products are marketed.

## B

The legislative history of § 42-133e (b) is instructive as to the degree of contractual control that a product supplier must retain over the marketing of its products in order for that control to constitute "[prescription] in substantial part" of the distributor's marketing plan or system. See 15 H.R. Proc., Pt. 7, 1972 Sess., pp. 2785–86, remarks of Representative Howard A. Newman (bill applies to arrangements by which distributor is in effect company store); id., p. 2777, remarks of Representative Webber (bill protects franchisees from imposition by franchisor of operating conditions "virtually impossible" to fulfill); id., p. 2780, remarks of Representative Mortensen (bill protects franchisees against "one-sided affairs"); id., p. 2785, remarks of Representative Newman (bill protects distributors terminated for refusing to purchase and distribute supplier's trading

stamps to customers). I would conclude, therefore, that, in order for a distributorship to constitute a franchise within the meaning of § 42-133e (b), the product supplier must retain pervasive *contractual* control over the manner in which the distributor markets the supplier's products.

## C

I turn now to the provisions of the agreement that governs the relationship between the plaintiff and the defendant. The agreement specifies that the plaintiff, *not the defendant,* is responsible for preparing business plans for the sale of the defendant's products in the local market. Specifically, with respect to each of the defendant's product lines, the agreement contains a provision that requires that the plaintiff prepare a business plan that includes some or all of the following elements: (1) identification of target accounts; (2) unspecified promotional activities; (3) sales forecasts; (4) inventory levels that are based on sales forecasts; (5) employee training sessions appropriate for the sale and support of the defendant's products; and (6) purchase and use of appropriate demonstration equipment. Thus, the business plan provisions of the agreement set forth only general categories to be addressed by the plaintiff in the business plans; they do not provide the defendant with any ability to mandate the inclusion of any specific provision in those business plans. I would conclude, therefore, that, as a matter of law, the provisions of the agreement that require the plaintiff to develop a business plan for the marketing and sale of the defendant's products do not grant to the *defendant* a contractual right to prescribe in substantial part the manner in which the plaintiff markets the defendant's products.

The only other provisions of the agreement that are relevant to the manner in which the plaintiff markets

the defendant's products are those that require that the plaintiff: (1) schedule specific training sessions for certain specialized employees; (2) maintain its inventory of the defendant's products at certain levels in order to ensure good customer service; and (3) purchase demonstration equipment for certain authorized product lines. Those provisions in effect require only that the plaintiff understand the defendant's products and have stock available for demonstration and sale; they do not dictate pervasively the manner in which the defendant's products are to be marketed. By way of contrast, the 1996 business plan that *the plaintiff* developed for marketing the defendant's products includes: (1) objectives set by the plaintiff for the sales and marketing of the defendant's products; (2) targeted sources of growth; (3) analysis of industrial and technological trends and the plaintiff's proposed responses to those trends; (4) analysis of the general economic environment; (5) market segment analysis; (6) analysis of the plaintiff's sales and marketing organization and objectives for fiscal year 1996; (7) analysis of the plaintiff's branch operations; (8) planned marketing initiatives; (9) summary of action items and proposed schedules for their implementation including individual territory plans and individual high-tech marketing plans by product category; and (10) sales and marketing budgets. Each component of the 1996 business plan was developed solely by the plaintiff; none was formulated by the defendant. I would conclude that, as a matter of law, the training, inventory and demonstration provisions of the agreement do not provide the defendant with sufficient contractual control over the manner in which the plaintiff markets the defendant's products to constitute a marketing plan or system prescribed in substantial part by the defendant.

The agreement, moreover, does not provide the defendant with any authority to control the plaintiff's

hiring or firing of employees. Nor does it contain any provision expressly granting the defendant authority to control a key element of the plaintiff's marketing system—the prices at which the plaintiff sells the defendant's products. See *Petereit* v. *S.B. Thomas, Inc.*, 63 F.3d 1169, 1181 (2d Cir. 1995), cert. denied, 517 U.S. 1119, 116 S. Ct. 1351, 134 L. Ed. 2d 520 (1996). In my view, as a matter of law, the mere fact that the defendant established manufacturer's suggested retail prices for its products does not provide a proper basis for concluding that the defendant had contractual authority to control the plaintiff's pricing. Any conclusion to the contrary would have the effect of transforming virtually every distributorship into a franchise. There is nothing in the legislative history to suggest that the legislature intended such a radical result. I would conclude, therefore, that as a matter of law, the agreement does not provide the defendant with the right to prescribe in substantial part the plaintiff's marketing plan or system as required by § 42-133e (b).

The majority does not maintain, moreover, that the agreement itself gave rise to a franchise within the meaning of § 42-133e (b). Instead, the majority reasons that it was the agreement *together with the defendant's concern program* that created a franchise between the parties. As previously noted, however, the concern program is relevant to the existence of a franchise only to the extent that it grants the defendant *contractual* control over the manner in which the plaintiff markets the defendant's products. The agreement, however, does not expressly require that the plaintiff participate in the concern program, and, in fact, the plaintiff maintains that it was not contractually required to do so.[6]

---

[6] Moreover, if participation in the concern program was a contractual obligation imposed by the defendant upon the plaintiff, the plaintiff's refusal to participate in that program would have constituted good cause for the defendant's termination of the agreement. In that case, § 42-133f would not have prohibited the defendant from terminating the agreement.

Because the agreement, by its terms, did not grant to the defendant a contractual right to prescribe in substantial part the plaintiff's marketing plan or system as required by § 42-133e (b), I would conclude that the parties' relationship did not constitute a franchise within the meaning of the statute.

## II

I turn now to the second requirement of § 42-133e (b) (2), namely that "the operation of the franchisee's business *pursuant to such [marketing] plan or system* [be] substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate . . . ." (Emphasis added.) The language of this requirement referring to visual commercial symbols suggests that, in order for a franchise to exist between a supplier and a distributor, the legislature intended not only that the supplier control pervasively the manner in which the distributor markets the supplier's products, but also that the marketing plan or system imposed on the distributor by the supplier create a substantial association between the distributor's and the supplier's business images.

The legislative history of House Bill No. 5081 also indicates that the substantial association requirement of § 42-133e (b) was intended to limit franchises to situations in which the franchisee's business image derives from the franchisor's marketing plan or system. See 15 H.R. Proc., supra, p. 2788, remarks of Representative Ronald A. Sarasin (bill applies to "fast food" franchises and to Holiday Inn, Ramada Inn, Howard Johnson, Avon Lady and Tupperware franchises); id., p. 2785, remarks of Representative Newman (discussing automobile dealerships and service station franchises); id., pp. 2783–84, remarks of Representative Carl R. Ajello (discussing automobile dealerships); id., p. 2786,

remarks of Representative Darius Spain (discussing Avon Lady and Tupperware franchises).

In sharp contrast to those examples, rather than require that the plaintiff associate itself with the defendant's commercial symbol, the agreement governing the parties' relationship explicitly prohibits the plaintiff from using the defendant's trademark as part of its company name or for any other purpose without the defendant's consent. During the discussion of House Bill No. 5081 on the floor of the House of Representatives, Representative Lenge, a proponent of the bill, stated that the proposed legislation would not apply to an agreement by which a manufacturer grants an independent hardware store an exclusive right to sell the manufacturer's products in the hardware store. Id., p. 2793. In my view, the degree of association that exists between the plaintiff and the defendant as a result of the plaintiff's display of the defendant's authorized dealer logo and the plaintiff's sale of the defendant's products is closer to the association that exists between an independent hardware store and its suppliers than it is to the level of association that exists between the business identities of a franchisor such as Burger King or Holiday Inn and its franchisees.

I am not persuaded, moreover, that, in the absence of a contractual limitation on the plaintiff's ability to sell the products of other manufacturers, the fact that the defendant's products account for approximately one half of the plaintiff's sales is a proper basis for concluding that the plaintiff's business is "substantially associated" with that of the defendant within the meaning of § 42-133e (b). See *Muha* v. *United Oil Co.*, 180 Conn. 720, 726, 433 A.2d 1009 (1980) (suggesting that in order for franchise to exist, seller must be contractually required to sell only supplier's products). If no such contractual limitation is required for a franchise to

exist, a distributor unilaterally could transform a distributorship into a franchise simply by increasing the percentage of its business devoted to the sale of a supplier's products. Such a unilateral transformation of a distributorship into a franchise would contravene the requirement set forth in § 42-133e (b) that a franchise be based upon a contractual "agreement or arrangement." I would conclude, therefore, that as a matter of law, the relationship between the plaintiff and the defendant does not satisfy the "substantial association" requirement set forth in § 42-133e (b) and that, consequently, the parties' relationship is not a franchise within the meaning of the statute.

The agreement provides the defendant with a right to terminate the plaintiff's distributorship without good cause on ninety days notice. Because I would conclude that the agreement does not constitute a franchise within the meaning of § 42-133e (b), even if we assume, without deciding, that the defendant lacked good cause to terminate the plaintiff's distributorship,[7] I would conclude that the defendant's termination of the agreement was not violative of § 42-133f (a), and that, consequently, that termination does not constitute an unfair trade practice in violation of § 42-110b. I therefore respectfully dissent.

---

[7] The agreement explicitly provides, moreover, that the plaintiff's "sales performance . . . shall be the *prime consideration* for the continued right hereunder to purchase and sell [the defendant's] [p]roducts." (Emphasis added.) It is undisputed that in fiscal year 1996, the plaintiff's sales of the defendant's products were 13.5 percent lower than sales of those products in fiscal year 1995. In my view, that decline in sales performance coupled with the plaintiff's admission that its 1996 business plan had "fallen off the tracks" and the plaintiff's refusal to participate in the concern program—a program designed to improve the plaintiff's sales performance—constitutes, as a matter of law, good cause for termination of the plaintiff's distributorship.