913 F.2d 7
 FEDERAL DEPOSIT INSURANCE CORPORATION, etc., Plaintiff, Appellee,
v.
Raymond SLINGER, et al., Defendants, Appellees (Three Cases).
Appeal of Joseph T. ELDRIDGE, et al., Defendants.
Appeal of Thomas P. CONNOLLY, Defendant.
FEDERAL DEPOSIT INSURANCE CORPORATION, etc., Plaintiff, Appellee,
v.
Raymond SLINGER, Defendant, Appellant.
Appeal of Frank C. KEANEY, Jr., and Michael J. Barbarita,
Jr., Defendants, Appellants.
 Nos. 89-1969 to 89-1972.
 United States Court of Appeals,
First Circuit.
 Heard June 5, 1990.
Decided Aug. 30, 1990.
 
 Donald J. Orkin with whom Mills, Orkin & Kaplan, Boston, Mass., was on brief, for appellant Raymond Slinger.
 Edward J. Canney, West Roxbury, Mass., for appellant Joseph T. Eldridge.
 Brian M. McMahon, Watertown, Mass., with whom James N. Doherty, Boston, Mass., was on brief, for appellant Thomas P. Connolly.
 Michael C. Gilleran with whom Shafner & Gilleran, Boston, Mass., was on briefs, for Frank C. Keaney, Jr., and Michael J. Barbarita, Jr.
 Before CAMPBELL and SELYA, Circuit Judges, and COFFIN, Senior Circuit Judge.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 In this interpleader action, the district court determined the rights and priorities of various parties to the proceeds from a mortgage foreclosure sale. We affirm.
 
 I. BACKGROUND
 
 2
 The facts can be summarized as follows.
 
 
 3
 1. On March 19, 1982, Janice I. Athanasopoulas became the trustee of the Farragut Realty Trust (the "Trust"), whose beneficiaries were David R. Bernotas and Raymond A. Slinger.
 
 
 4
 2. On April 30, 1982, the Trust purchased an apartment building (the "property") in Dorchester, Massachusetts for $480,000. To finance the purchase, the Trust secured a mortgage from a bank for $260,000 (the "First Mortgage") and one from the seller of the property for $220,000 (the "Second Mortgage").
 
 
 5
 3. On July 30, 1982, the Trust secured another mortgage from Paul and Marjorie Tirone for $50,000 (the "Third Mortgage").
 
 
 6
 4. On July 5, 1983, the Trust was purportedly changed into a "Massachusetts Business Trust," see Mass.Gen.L. ch. 182. From this point on, Raymond Slinger was the sole trustee and the sole beneficiary of the Trust.
 
 
 7
 5. On November 14, 1983, Richard Williams brought suit (the "Williams litigation") to compel Slinger to sell the property pursuant to an alleged contract. To protect his potential interest in the property, Williams recorded a notice of a lis pendens.[1] Williams eventually lost his suit following a trial four years later in June 1987.
 
 
 8
 6. On March 28, 1984, Slinger, acting as "trustee" of the Trust, agreed to sell the property, which at this time was subject to the first three mortgages and the lis pendens, to Francis C. Keaney, Jr. and Michael J. Barbarita Jr. (the "buyers"). The parties negotiated a Purchase and Sale Agreement (the "agreement" or the "P & S").
 
 
 9
 7. The P & S included the following terms, among others, relevant to this appeal:
 
 
 10
 (a) the purchase price would be $675,000, which the buyers would provide by (1) depositing with Slinger $40,000 in cash upon signing the P & S, (2) giving Slinger a $110,000 purchase money mortgage, and (3) giving Slinger $525,000 in cash via a mortgage from a bank or other institutional lender;
 
 
 11
 (b) the closing date would be June 1, 1984;
 
 
 12
 (c) time was "of the essence of this agreement;"(d) the buyers would "apply promptly" for the $525,000 mortgage. In the event they could not obtain such mortgage (and thus could not conclude the agreement), they could terminate the P & S in writing within 50 days, whereby Slinger would refund the $40,000 deposit and the agreement would be cancelled;
 
 
 13
 (e) in the event Slinger was "unable to give title or make conveyance, or to deliver possession of the premises," then, after a 30-day extension period, the buyers retained the option of receiving the $40,000 deposit back and cancelling the agreement;
 
 
 14
 (f) the terms of the agreement could be modified or amended only if all parties agreed in writing; and
 
 
 15
 (g) the agreement was "to be construed as a Massachusetts contract."
 
 
 16
 8. After signing the agreement, the buyers immediately began trying to obtain financing for their purchase of the property. They soon learned, however, that it would be impossible to secure financing by June 1, 1984, the agreement's closing date.
 
 
 17
 9. In early May, Keaney told Slinger that the buyers could not secure financing before the closing date and that their attorney had advised them to send a letter requesting an extension. Slinger responded that an extension letter "really wasn't necessary" but, if their attorney advised it, then they should proceed to send it. The buyers sent the extension letter (the first of many) a few days later on May 15, 1984.
 
 
 18
 10. The parties then met on June 9, 1984, eight days after the agreement's closing date. At the meeting, Slinger encouraged Keaney and Barbarita to continue to seek financing and discussed with them their subsequent efforts to do so.
 
 
 19
 11. As the months progressed, the buyers sent periodic extension letters to Slinger and kept him informed as to their efforts to obtain financing. Throughout this time, Slinger retained the $40,000 deposit.
 
 
 20
 12. On July 31, 1985, Keaney and Barbarita received tentative approval for a $450,000 mortgage to finance their purchase of the property, and Keaney contacted Slinger and told him they had "received a commitment." Slinger informed Keaney, however, that he "had a little problem"--he could not close because of the lis pendens.[2] He assured Keaney that they could purchase the property once that matter was resolved.
 
 
 21
 13. Keaney and Barbarita responded with a series of letters assuring Slinger that they were still willing to purchase the property and extending the agreement until Slinger resolved the title problem.
 
 
 22
 14. In answer to one of the extension letters, on December 23, 1985, Edward J. Canney, who was representing Slinger with regard to this matter and the Williams litigation, told the lawyer for the buyers that Slinger was agreeable to an extension but would prefer not to sign such an agreement at that time because of the Williams litigation.
 
 
 23
 15. On February 5, 1986, Joseph T. Eldridge, a business associate of Slinger who was also represented by Canney, took and recorded an assignment of the Third Mortgage (dated July 30, 1982)[3]. Soon thereafter, Slinger gave Eldridge a promissory note of $120,000, secured by another mortgage on the property (the "Fourth Mortgage"). During both these transactions, Eldridge was aware of the P & S.
 
 
 24
 16. Slinger apparently defaulted on his various mortgage payments, and in July 1986, Eldridge, as holder of the Third and Fourth Mortgages, commenced foreclosure proceedings on the property. The proceedings, however, were enjoined pending completion of the Williams litigation.
 
 
 25
 17. In June 1987, Slinger prevailed in the Williams litigation.
 
 
 26
 18. In August 1987, the bank holding the First Mortgage conducted a foreclosure sale of the property. Keaney and Barbarita were unaware of the sale. The highest bidder was Thomas Connolly, who bid $1,080,000. Connolly later assigned his bid to R. David Cohen, who in turn assigned his rights to Regina Freitas.
 
 
 27
 19. Upon learning of the foreclosure sale, the buyers sent Slinger a letter requesting their $40,000 deposit back, stating that it was no longer "possible for [Slinger] to perform under the Purchase and Sale Agreement by delivery of the Deed." The buyers also brought suit against Slinger in state court.
 
 
 28
 20. In November 1987, the FDIC, acting as receiver for the bank that held the First Mortgage, acquired the proceeds from the foreclosure sale. After paying off the First Mortgage and Second Mortgage, the FDIC retained an excess balance of $284,850. Not knowing how to disburse the remaining funds, the FDIC brought the present interpleader action.
 
 
 29
 21. Following a bench trial, the district court directed the Clerk of Court to disburse the escrow fund, which contained the above excess balance (plus interest and minus the FDIC's costs), according to the following priorities:
 
 
 30
 (a) first, Eldridge would receive payment of the Third Mortgage in the amount of $112,000 (plus interest);
 
 
 31
 (b) second, the buyers would receive $445,000 (plus interest);
 
 
 32
 (c) third, Eldridge would receive payment of the Fourth Mortgage in the amount of $217,728;[4] and
 
 
 33
 (d) Connolly and Freitas were not entitled to participate in the distribution.
 
 
 34
 22. The court also awarded the buyers $490,000 (plus interest and minus any amounts collected from the escrow fund) on their claim against Slinger personally.
 
 
 35
 23. Connolly, Eldridge, Slinger, and the buyers then filed notices of appeal.
 
 II. THE MERITS
 
 36
 The appealing parties allege a litany of errors below, which can be divided into three categories. First, Slinger, Eldridge, and Connolly argue that the court erred in determining that the buyers had an enforceable agreement at the time of the foreclosure sale. Second, all parties offer separate arguments for why the court erred in determining the priority of the various claims. Finally, Slinger contends that the court erred in holding him personally liable. We address each category in turn.
 
 A. The Enforceability of the P & S
 
 37
 We first decide whether the district court erred in determining that the P & S was enforceable at the time of the foreclosure sale, giving the buyers an equitable interest in the property. Upon review of the record and Massachusetts law, cf. Curley v. Mobil Oil Corp., 860 F.2d 1129, 1132 (1st Cir.1988) (reviewing interpretation of Massachusetts contract), we find no legal error, and we conclude that the district court's factual determinations are not clearly erroneous.
 
 
 38
 We look first at the agreement's time-is-of-the-essence clause, which creates a presumption that the parties' intent was that the closing date would be mandatory. If neither party tenders performance on the closing date, then absent (1) a waiver, (2) an express contractual provision to the contrary, (3) a modification, or (4) an estoppel, both parties are discharged from performing once the closing date passes. See, e.g., Devine v. Williams Bros., Inc. of Marshfield, 4 Mass.App. 816, 348 N.E.2d 445, 446 (1976) ("Time having been of the essence and there having been no tender of performance at the appointed time, both partes were discharged."); American Oil Company v. Katsikas, 1 Mass.App. 437, 300 N.E.2d 204, 206 (1973) ("In the absence of waiver or modification, the contract provision terminating the agreement upon passage of the closing date without tender of performance must be given effect. At the expiration of the closing date, without tender of either party, the contact was at an end, and both parties were discharged."). The initial inquiry, therefore, is whether the district court properly found that the presumption of discharge after the closing date, created by the time-is-of-the-essence clause, was rebutted. See generally 3A A. Corbin, Corbin on Contracts Sec. 663 at 103-04 (Supp.1990) (discussing Massachusetts case law, concluding that Devine v. Williams Bros., Inc. of Marshfield created a rebuttable presumption in favor of discharge).[5]
 
 
 39
 The district court relied on four grounds in support of its holding that the buyers had overcome the presumption of discharge. First, Slinger "tacitly consented" to the buyers' various extension requests, which had the effect of waiving the time-is-of-the-essence clause. Second, on December 23, 1985, Slinger, acting through his lawyer, Canney, explicitly consented to the buyers' request for an extension, which effected a similar waiver. Third, the agreement's "mortgage contingency clause"[6] modified the time-is-of-the-essence clause by implicitly requiring Slinger to refund the $40,000 deposit before he could cancel the agreement. Because Slinger never returned the $40,000, the agreement remained in effect at the time of the foreclosure sale. Fourth, during the Williams litigation, Slinger could not have performed under the P & S, and, once the litigation ceased, the buyers were in a position to perform. Slinger's inability to secure good title during that time excused the buyers' inability to perform on the date of closing.
 
 
 40
 Without reaching the latter two grounds, we uphold the court's first two grounds--that Slinger tacitly and, later, explicitly, waived the agreement's time-is-of-the-essence clause. In Massachusetts, a party can waive such a provision through speech or conduct indicating that the provision has ceased to be of importance. See, e.g., Church of God in Christ v. Cong. Kehillath Jacob, 370 Mass. 828, 353 N.E.2d 669, 673 (1976) (time-is-of-the-essence clause is waived where parties agree to extension); Gentile Bros. Corp. v. Rowena Homes, Inc., 352 Mass. 584, 227 N.E.2d 338, 342 (1967) (time-is-of-the-essence clause is waived where (1) neither party indicated that failure to convey on closing date would "spell the end of the agreement;" (2) prior to the closing date, parties indicated to each other that "the agreement should be carried out at a later date;" and (3) after the closing date, parties agreed on new date of performance.). See generally 3A A. Corbin, Corbin on Contracts, Sec. 722 at 380 (1960) ("Where time is of the essence, meaning that performance on time is a condition of the other party's duty, this condition can be waived by a mere expression of willingness by that other party; an 'extension of time' is such a waiver.").
 
 
 41
 Here, the evidence permitted the court to conclude that (1) prior to the closing date, Slinger told the buyers that an extension letter "really wasn't necessary," and (2) after the closing date, his attorney explicitly granted the buyers' extension request. From this conduct, viewed in the context of the parties' dealings with each other, the court was entitled to determine that Slinger had agreed to an extension, thereby waiving the agreement's time-is-of-the-essence clause. Church of God in Christ, 353 N.E.2d at 673; Gentile Bros. Corp., 227 N.E.2d at 342; cf. Katsikas, 300 N.E.2d at 206 (no waiver where "there was no evidence indicating that anything was done or said at that meeting, or thereafter, to modify or waive the agreed upon closing date.") (emphasis added).
 
 
 42
 Since Slinger waived the time-is-of-the-essence clause, he was bound to the agreement for a reasonable time following the signing date. Curley v. Mobil Oil Corp., 860 F.2d 1129, 1134 (1st Cir.1988) (applying Massachusetts law, stating that "a party is bound to an agreement to sell land for no more than a reasonable time before closing takes place where the agreement does not specify a date for performance"). We find no clear error in the district court's implicit finding that, in these circumstances, three years and two months was a reasonable time. In the three years following the closing date, Slinger could not have performed because of the lis pendens. And in June of 1987, when the lis pendens was removed, the buyers were ready to perform. Given that the foreclosure sale occurred only two months after the removal of the lis pendens, the district court was entitled to find that the agreement remained in effect until the date of foreclosure.[7] See, e.g., Church of God in Christ, 353 N.E.2d at 673 (eight-month delay after closing date was reasonable "[i]n view of our opinion that there was a waiver and that time was not of the essence, and testing all the circumstances of this case including the conduct of the parties...."); Kattor v. Adams, 323 Mass. 686, 84 N.E.2d 124, 126 (1949) (inferring that over three-year delay was reasonable where both parties appeared to have acquiesced in delay); Curley, 860 F.2d at 1134 (five-month period reasonable).
 
 
 43
 Slinger (with assistance from Eldridge and Connolly) advances numerous arguments against the district court's ruling. First, Slinger argues essentially that, even if he waived the time-is-of-the-essence clause, the waiver was ineffective as a matter of law because (1) it was not in writing and (2) it was unsupported by additional consideration. We disagree. Slinger's oral waiver of the condition had legal effect irrespective of the presence of a writing or consideration.[8] See, e.g., Johnson v. Kelley, 342 Mass. 724, 175 N.E.2d 391, 392-93 (1961) (even though written contract for sale of land provided fixed date for closing and made time "of the essence," parties could orally advance the date and then orally agree on a later date.). See generally 3A A. Corbin, Corbin on Contracts, Sec. 754 at 493 (1960) ("A waiver of performance on time as a condition of contract rights and duties is effective without any consideration."); E.A. Farnsworth, Contracts Sec. 8.5 at 562 (1982) (unlike a modification, a valid waiver does not require an assent, a writing, consideration, or detrimental reliance).
 
 
 44
 Second, Slinger argues that under the agreement's mortgage contingency clause, he was discharged from performing once the buyers failed to obtain financing within 45 days from the date of the agreement. The clause provides in pertinent part:
 
 
 45
 If despite the Buyer's diligent efforts a firm commitment for such loan cannot be obtained within forty-five (45) days from the date of this Agreement, then the Buyer may terminate this Agreement by written notice to the Seller ..., whereupon all deposits made under this Agreement ... shall be forthwith refunded and this Agreement shall be null and void.... If the Seller has not been notified by Buyer, in accordance with this provision, of the Buyer's failure to obtain said mortgage loan, then the Buyer shall be deemed to have obtained said loan and shall be deemed to have waived its right to cancel the Agreement under this provision.
 
 
 46
 (Emphasis added). We reject this argument, as, among other things, it is unsupported by the language of the cited clause. That provision speaks only of the buyers' waiver of their right to cancel the agreement--it does not address, and has no impact on, the buyers' right to enforce Slinger's waiver of the agreed-upon closing date.
 
 
 47
 Finally, Slinger argues that the buyers' letter to Slinger (sent after the foreclosure sale) requesting the return of their deposit had the legal effect of rescinding the agreement. In the letter, the buyers stated that they had learned that the "holder of the First Mortgage on the Premises ... has conducted a foreclosure sale on the Premises which has rendered it not possible for you to perform under the [P & S] by delivery of the Deed." The buyers further stated that "[t]herefore, since it appears that you shall be unable to give title or to make conveyance or to deliver possession of the Premises as stipulated in the [P & S], then, ... we hereby request the deposit paid and interest accrued thereon, pursuant to paragraphs 7, 30, and 33 of the [P & S][9], be forthwith refunded." Slinger contends that the only correct interpretation of this letter is that it sought to cancel the agreement pursuant to paragraphs 10 and 11 of the P & S,[10] which allowed the buyers to cancel the agreement if Slinger could not "deliver possession."
 
 
 48
 In rejecting Slinger's argument, the district court reasoned that:
 
 
 49
 Wernick's letter of August 19, 1987, did not terminate the rights of Keaney and Barbarita under the [P & S]. By that time, the foreclosure proceedings already had begun; Slinger thus could not complete the sale; and Keaney and Barbarita were entitled to have their $40,000 deposit returned, irrespective of whether any of their rights under the purchase and sale agreement had endured.
 
 
 50
 In effect, the district court interpreted the buyers' letter as requesting the deposit as damages for an alleged breach of the agreement by Slinger, rather than as requesting the deposit pursuant to a cancellation of the otherwise valid agreement. We see no clear error in this interpretation, especially given that the buyers' letter failed to mention paragraph 10 or 11 of the agreement, and Slinger never sought or received "extended time" pursuant to those paragraphs.
 
 
 51
 Accordingly, upon considering the various arguments advanced by Slinger, Eldridge, and Connolly, we hold that the district court did not err in ruling that the P & S endured to the time of the foreclosure sale.
 
 B. The Priority of the Interests
 
 52
 We turn next to whether the district court erred in determining the priority of the various claims. As already stated,[11] the district court ordered disbursement of the surplus proceeds from the foreclosure sale so that (1) Eldridge would receive payment of the Third Mortgage, followed by (2) the buyers receiving the amount of their claim. Although no funds remained after these first two disbursements, the court noted that, had such funds remained, Eldridge would have been entitled to receive payment of the Fourth Mortgage. The court did not permit Connolly to participate in the distribution. Finding no flaw in these rulings, we briefly address (and reject) each party's claim of error.
 
 1. The Buyers' Claim of Error
 
 53
 The buyers contend that the district court erred in granting the Third Mortgage priority over their claim. They do not dispute that, had the original owners of the Third Mortgage retained their ownership (rather than assigning the mortgage to Eldridge), this 1982 mortgage would have had priority over the buyers' 1984 contract. Moreover, the buyers do not dispute the validity of the 1986 assignment to Eldridge. Instead, the buyers argue that, when the original owners assigned the Third Mortgage to Eldridge in 1986, the Third Mortgage suddenly lost its priority over their claim, because Eldridge took with notice of their claim. This argument is frivolous.
 
 
 54
 In their brief, the buyers' argument begins and ends with the "most basic principle regarding bona fide purchasers[,] ... [that] an assignee of a mortgage, if he has knowledge of a prior pending claim, takes subject to that claim even though he pays value." (emphasis added). See generally 55 Am.Jur.2d Mortgages Sec. 1304 (1971). This argument, however, has no bearing here, where the assignee of the mortgage took with knowledge of a later claim. If, prior to the assignment, the 1982 mortgage had priority over the 1984 claim, then the mortgage continued to have priority after the valid assignment, even though the assignee knew of the 1984 claim. As the district court found, Eldridge, as assignee, "stands in the shoes of his assignor, who transferred to him a perfectly valid mortgage against which Keaney and Barbarita could claim no preference." See, e.g., United States Trust Co. v. Commonwealth Exchange Trust Co., 245 Mass. 75, 139 N.E. 794, 796 (1940) ("The assignee of a mortgagee by duly recorded assignment ... has the same rights, interests, and benefits as the original mortgagee as to all persons other than his assignor and pledgor.").[12]
 
 2. Slinger's and Eldridge's Claim of Error
 
 55
 Eldridge and Slinger argue that the district court erred in granting the buyers' claim priority over the Fourth Mortgage. We find no error.
 
 
 56
 In Massachusetts, "the equitable rights of one having an interest in land by virtue of a contract are enforceable against a purchaser with notice of such contract rights." International Paper Co. v. Priscilla Company, 281 Mass. 22, 183 N.E. 58, 60 (1932). To have notice of another's contract rights, a purchaser must possess "knowledge of the contract['s] details." Altman v. Stiegel, 349 Mass. 768, 209 N.E.2d 191, 192 (1965). And a purchaser's "knowledge of facts merely putting [him] upon inquiry is not enough to charge [him] with notice of [one's] equitable interest." Id.
 
 
 57
 Here, the district court held that the buyers' equitable rights in the property by virtue of the P & S were enforceable against the Fourth Mortgage (i.e., given priority) because "Eldridge had knowledge or notice of the subject purchase and sale contract, either actually through his close relationship with Slinger, and/or because the knowledge of [attorney] Canney is imputed to him." None of the appellants has challenged this first finding of fact, and so we do not disturb it.[13] It follows that the district court's ruling--that the buyers had priority over the Fourth Mortgage because Eldridge had notice of the buyers' contract rights--was proper. See International Paper Co., 183 N.E. at 60.[14]
 
 
 58
 In upholding the court's determination, we need not address Eldridge's argument that the district court erred in calculating his interest with regard to the Fourth Mortgage, as no funds will remain after the first two claims are paid.
 
 3. Connolly's Claim of Error
 
 59
 Connolly argues that the district court erred in refusing to allow him to take part in the distribution. His claim fails.
 
 
 60
 On August 12, 1987, after making a successful bid on the property, Connolly contracted with Slinger to purchase Slinger's entitlement to any surplus of the sale proceeds after payment of the expenses of the sale and the four mortgages.[15] The district court found that, because no surplus of the sale proceeds existed following payment of (1) the expenses of the sale, (2) the four mortgages, and (3) the buyers' claim, Slinger was not entitled to any money from the fund. The court concluded, therefore, that Connolly could not receive any money pursuant to his contract with Slinger.
 
 
 61
 Connolly's specific allegation of error is the district court's decision to include the buyers' claim in the accounting of the surplus proceeds. We need not address this alleged error, however, because even assuming that the buyers' claim is not included in the accounting, Connolly would not be entitled to any surplus proceeds. After subtracting (1) the expenses and (2) the four mortgages, no surplus funds would remain to which Slinger (and, therefore, Connolly) would be entitled.[16]
 
 C. Slinger's Liability
 
 62
 A final question is whether the district court erred in holding that Slinger, "being the sole beneficiary, as well as trustee, is individually liable for any judgment rendered against him as a result of his activities that are relevant to this action." We find no error.
 
 
 63
 Under Massachusetts law, a trustee/beneficiary is not entitled to the benefits associated with business trust status if he is the sole trustee and the sole beneficiary. See Neville v. Gifford, 242 Mass. 124, 136 N.E. 160 (1922) (defendants failed to create trust where both shareholders are trustees); cf. Druker v. State Tax Comm'n, 374 Mass. 198, 372 N.E.2d 208, 211 (1978) (taxpayer not entitled to tax benefits of trust where he "was the sole settlor, sole trustee, and sole beneficiary--an identity of interests fundamentally incompatible with the recognition of a trust as a separate entity").
 
 
 64
 On July 5, 1983, Slinger became the sole beneficiary and the sole trustee of the Trust. From that time on, he was not entitled to the special protections of business trust status. Accordingly, notwithstanding Slinger's arguments to the contrary[17], the district court committed no error in holding Slinger personally liable for breach of contract. See generally 3 Z. Cavitch, Business Organizations Sec. 43.08 at 43-35 (1990) ("if all shareholders are trustees, the business trust will become ineffective as a means of avoiding personal liability for the subscribers"); 16A D. Nelson and M. Wasiunec, Fletcher Cyc Corp Sec. 8240 at 765 (1988) ("where the same persons are both trustees and beneficiaries there is no trust, and all are individually liable on a guaranty contract signed in name of purported trust.").
 
 III. CONCLUSION
 
 65
 For the foregoing reasons, the judgment of the district court is affirmed. The parties to bear their own costs.
 
 
 
 [1]
 A notice of a lis pendens warns potential buyers of a property that title to the property is in litigation. See H. Black, Black's Law Dictionary 1081 (4th ed. 1968)
 
 
 [2]
 See number five, supra
 
 
 [3]
 See number three, supra
 
 
 [4]
 Although no funds would remain after the first two distributions, the court's determination of the priority and amount of the Fourth Mortgage helped to clarify one of the issues on appeal. See section II(B)(3), infra
 
 
 [5]
 The buyers argue that under Massachusetts law, both sides' failure to tender performance kept the agreement enforceable until the time of the foreclosure sale. See, e.g., Flynn v. Wallace, 359 Mass. 711, 270 N.E.2d 919, 922 (1971) ("In order to put the purchaser in default, it is normally required that the vendor tender a proper conveyance on the date set for performance."); Zerner v. White, 350 Mass. 773, 215 N.E.2d 796, 796 (1966) ("Since the seller had not offered and was not excused from offering performance, he could not put the buyers in default."); Ward v. Doucette, 1 Mass.App. 842, 301 N.E.2d 256, 256 (1973) ("[W]e are confronted with a situation in which neither party has completed his side of the bargain or made a legal tender to the other. It has long been established that absent a legal tender on the part of either party, neither can be deemed in default."). See generally 3A A. Corbin, Corbin on Contracts Sec. 663 at 178 (1960) ("By making proper tender of his own performance at any reasonable time and place, either party can put the other under a duty of immediate performance. Without such a tender neither party is in default, or guilty of breach of duty."). The flaw in this argument is that it ignores the agreement's time-is-of-the-essence clause, which created a presumption (albeit a rebuttable one) that the closing date would be mandatory. See, e.g., Devine, 348 N.E.2d at 446; Katsikas, 300 N.E.2d at 206. In both Flynn and Ward, the court noted that the agreement under review lacked such a clause. See Flynn, 270 N.E.2d at 922 (parties not discharged where "the agreement contained no provision that time was of the essence"); Ward, 301 N.E.2d at 256 (parties not discharged where "time [was] certainly not of the essence"). We must accordingly reject the buyers' contentions in this regard
 
 
 [6]
 This clause is paraphrased in section I, number 7(d), supra, and quoted, infra
 
 
 [7]
 Like the district court, we see no critical legal significance in Keaney's admission on cross-examination that at one point during the extension period, he thought to himself that the purchase price would probably need to be renegotiated
 
 
 [8]
 We note the buyers' plausible argument that the extension was indeed supported by consideration because (1) Slinger continued to hold the $40,000 deposit; and (2) the buyers continued to seek financing
 
 
 [9]
 These paragraphs refer to the amount of the purchase price and deposit. They do not refer to any method of cancellation
 
 
 [10]
 Paragraphs 10 and 11 read as follows:
 
 
 [10]
 If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then the SELLER shall use best efforts to remove any defects in title, to deliver possession as provided herein, and to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance shall be extended for a period of 30 days
 
 
 [11]
 If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of the mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then, at the BUYER'S option, any payments made under this agreement shall be forthwith refunded and all other obligations of all parties hereto shall cease and this agreement shall be void without recourse to the parties hereto
 
 
 [11]
 See section I, number 22, supra
 
 
 [12]
 In upholding the district court's determination of the priority of the Third Mortgage, we further uphold the district court's use of simple (as opposed to compound) interest. In Massachusetts, in the absence of an express agreement, parties may not compound interest. See Coupounas v. Madden, 401 Mass. 125, 514 N.E.2d 1316, 1321-22 (1987) (citing cases). Eldridge has failed to establish that the district court committed clear error in finding that no express agreement to use compound interest existed
 
 
 [13]
 Because the court's finding of actual knowledge is unchallenged, we do not address Slinger's argument that the district court erred as a matter of law in imputing the knowledge of Eldridge's (and Slinger's) attorney, Canney, to Eldridge
 
 
 [14]
 Eldridge apparently argues that, even if he had actual knowledge of the agreement, the buyers' failure to record the agreement prevents them from claiming priority over the Fourth Mortgage. We reject this and other related arguments, as they ignore controlling Massachusetts case law. See International Paper Co., 183 N.E. at 60 (no mention of duty to record); Altman, 209 N.E.2d at 192 (same)
 
 
 [15]
 The contract reads as follows:
 Agreement made this 12th day August 1987 by and between Raymond A. Slinger, Trustee of the Farragut Realty Trust And Thomas Connolly:
 Raymond A. Slinger, Trustee of the Farragut Realty Trust in consideration of Thomas Connolly's purchase at auction of the premises on 20 Dix Street, Dorchester, MA hereby agrees to refund to Thomas Connolly any monies received by Raymond A. Slinger, Trustee in excess of mortgages due on the above property.
 The term 'money received' shall mean any funds that Raymond A. Slinger, Trustee shall receive in hand after payment of mortgages, auction expenses, taxes, and any other bills which are associated with the foreclosure and are either in the hands of the Land Court or the attorney's representing Yankee Bank.
 
 
 [16]
 As Connolly makes no specific argument that the court committed clear error in calculating (1) the expenses of the claim and (2) the amounts due on the four mortgages, we do not disturb these findings
 
 
 [17]
 For example, Slinger argues that paragraph 26 of the agreement precludes the buyers from holding Slinger personally liable for any obligation stemming from the agreement. That paragraph reads:
 If the SELLER or BUYER executes this agreement in a representative capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing nor any shareholder or beneficiary of any trust shall be personally liable for any obligation, express or implied hereunder.
 This provision does not aid Slinger, however, as he did not "execute[ ] this agreement in a [valid] representative capacity...." Slinger's alternative argument--that Mass.Gen.L. ch. 203 Sec. 14A protects him from personal liability--fails for the same reason.