**Glenn STETZER, Grando, Inc., and 4 Donuts, Inc., Plaintiffs,**

v.

**DUNKIN' DONUTS, INC., Defendant.**

No. 3:97CV01514(GLG).

United States District Court, D. Connecticut.

Feb. 16, 2000.

Santo Mark Matarazzo, Rocky Hill, CT, for the Plaintiffs.

Nicholas P. Cardwell, Cardwell, Cardwell & Smoragiewicz, Hartford, CT, Robert Zisk, Adrienne T. Vadell, Schmeltzer, Aptaker & Shepard, Washington, DC, for the Defendant.

## OPINION

GOETTEL, District Judge.

This is a contract action brought by Plaintiffs Glenn Stetzer, Grando, Inc., and 4 Donuts, Inc. against Defendant Dunkin' Donuts, Inc. ("Dunkin'") over Defendant's refusal to license Plaintiffs a franchise location. The Court's jurisdiction is invoked under the diversity provisions of 28 U.S.C. § 1332, after removal from state court. Defendant has moved for summary judgment on all counts (Doc. # 21). For the reasons given below, the Court **GRANTS** in part and **DENIES** in part Defendant's motion.

Plaintiff Stetzer is an individual franchisee who, as principal of Plaintiffs 4 Donuts, Inc. and Grando, Inc., owns and operates six Dunkin' Donuts stores in the New Haven, Connecticut area. Defendant Dunkin' is a Delaware corporation that owns and operates the Dunkin' Donuts franchising business. At issue in this case is Defendant's refusal to renew its approval of Plaintiffs' seventh franchise site, located on Hemingway Avenue in East Haven, after Plaintiffs allegedly failed to pay the franchise and grand opening fees on a timely basis.

Plaintiffs initially brought this action in state court on July 3, 1997, setting forth six counts in the complaint: (1) breach of Dunkin' Donuts Exclusive Development Agreement; (2) breach of the Site Approval/Features Letter; (3) violation of the Connecticut Franchise Act, Connecticut General Statutes (Conn.Gen.Stat.) §§ 42–133e–h; (4) bad faith; (5) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42–110a–q; and (6) promissory estoppel and/or detrimental reliance on Defendant's representations that the new shop location would be

approved and that Plaintiffs would be given sufficient time to open the new shop for business. Defendant denies all of Plaintiffs' allegations and asserts various affirmative defenses. Defendant removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446 on July 28, 1997, and now moves for summary judgment as to all counts.

## BACKGROUND

The record before the Court, viewed most favorably to the Plaintiffs, would permit a jury to find the following facts.

Stetzer and 4 Donuts entered into an Exclusive Development Agreement ("EDA") with Defendant Dunkin' on June 4, 1992.[1] The EDA, which was prepared by Dunkin', was an integrated agreement that represented the "entire, full and complete agreement between Licensor and Licensee concerning the subject matter hereof . . . ." EDA para. 18. The EDA granted Stetzer and 4 Donuts an exclusive license to develop and operate Dunkin' Donuts shops within a predetermined territory within the New Haven area. Stetzer signed the EDA in his capacity as president of 4 Donuts. In a separate document entitled "Personal Guarantee of Officers, Shareholders and Directors of a Corporation or Partners of a Partnership," also executed on June 4, 1992, Stetzer personally guaranteed the full payment and performance of 4 Donuts' obligations under the EDA.

Pursuant to the terms of the EDA, Stetzer and 4 Donuts initially opened and operated one "satellite" Dunkin' Donuts shop and one "cart system" (the two so-called "Specified Units" in the EDA) in the New Haven area, paying total initial franchise fees of $20,000.

In section 1.B of the EDA, Dunkin' granted Stetzer and 4 Donuts a license to develop and operate additional units contingent upon their obtaining prior written consent and compliance with the terms of the EDA as well as timely opening of the "Specified Units" in accordance with the EDA's development schedule. There is no dispute that Stetzer and 4 Donuts opened the Specified Units in a timely fashion. They subsequently opened four additional units, including a "full producer" store, two additional satellite stores, and one additional cart system, for a total of six franchise units. (Stetzer Dep. at 10–11.)

In February 1996, Stetzer requested site approval from Dunkin' in order to develop a seventh additional unit to be built at 12 Hemingway Avenue in East Haven, a location within the territory covered by the EDA. Dunkin' granted site approval in its "Site Approval/Features Letter" ("letter agreement") dated June 11, 1996, addressed to Stetzer[2] and signed by Richard Zuromski, Development Manager of Dunkin' Donuts, Inc. The letter agreement discussed the favorable and unfavorable features of the proposed site, listed the steps that Stetzer was required to follow prior to commencing construction, and demanded payment of the "Initial Franchise Fee" of $5000 and the "Grand Opening Fee" of $3000 (collectively "franchise fees") by June 29, 1996.[3] The letter agreement warned that Dunkin' might withdraw the site approval if Stetzer failed to return the franchise fees and a signed copy of the letter agreement by the due date. The letter agreement further provided in bold print:

---

1. Grando, Inc., one of the corporations through which Stetzer operates his franchises, was not a party to the EDA or to the letter agreement in question between Stetzer, 4 Donuts, and Dunkin'. Grando was, however, the named party on the thirty-year lease of the property for the new store which is the subject of this suit.

2. Neither 4 Donuts nor Grando, Inc. was party to the letter agreement.

3. The letter agreement states that the fees "are due no later than fourteen (14) days after the date of this letter," which would set the due date at June 25, 1996. In a later paragraph, however, the due date is set at June 29, 1996.

**This Site Approval is valid for one year (June 11, 1997) from the day this letter is sent out. Failure to have the site opened for business will result in the site going back for review for approval.**

Plaintiffs allege that before Stetzer signed the Site Approval letter, he contacted Richard Zuromski, Dunkin's Development Manager, by telephone to express his concern over the one-year deadline and the provision requiring payment of the franchise fees within fourteen days. Pl.'s Dep. at 27–30, 32–35, 121–22. Plaintiffs claim that Zuromski assured Stetzer that the one-year deadline was merely a projected target date which would not be strictly enforced, and that Plaintiffs would be granted an extension if they needed more time to open the store. *Id.* Plaintiffs assert that the language in the letter agreement referring to "the site going back for review for approval" means that the site would be re-approved for another year. Plaintiffs do not claim that Zuromski made any representations that the franchise fees were due only upon the execution of the Franchise Agreement. *Id.* at 103–04. Plaintiffs also claim that Zuromski assured them that Dunkin' would mail them a franchise agreement. *Id.* at 95–99, 105–06. Stetzer signed the letter agreement on June 21, 1996, agreeing to and accepting its terms, although he did not remit the required fees at that time.

Stetzer and 4 Donuts began to develop the Hemingway Avenue site pursuant to the letter agreement, entering into a thirty-year lease for the Hemingway Avenue property in the name of Grando, Inc., one of Stetzer's corporate entities, and applying for the required zoning permits. Plaintiffs claim to have spent considerable sums of money for engineering costs, architectural fees, attorneys' fees, and application fees. Zuromski concedes that Dunkin' did not send Plaintiffs a copy of Dunkin's "then current standard form [franchise] Agreement," as required in paragraph 5 of the EDA, until October, 1996. Stetzer completed the franchise agreement in the name of Grando, Inc., signed it in his capacity as President of Grando, dated the agreement January 6, 1997, and returned it to Dunkin' in January, 1997. He did not, however, remit the franchise fees at that time, because he maintains that the franchise fees were not due until Dunkin' signed and returned the franchise agreement.

Dunkin' continued to communicate with Stetzer until April, 1997, sending letters dated Dec. 17, 1996, Mar. 5, 1997, Mar. 11, 1997, and Apr. 16, 1997, notifying him of his failure to comply with the prescribed new shop development procedures.[4] The last of the letters, dated April 16, 1997, warned that "any further site development and/or assistance by Dunkin' Donuts staff will be *suspended* until all associated documents and fees ·are received by Dunkin' Donuts Incorporated." (emphasis in original).

Complaining of delays in obtaining the necessary zoning approvals, Stetzer wrote to Dunkin' on April 21, 1997 seeking a one-year extension of time, to June 11, 1998, in which to open the store. On April 29, 1997, over ten months after he signed the letter agreement, Stetzer remitted the franchise fee of $5000 and the $3000 grand opening fee, conditioning the payments on receiving the one-year extension. Dunkin' denied the extension and returned the proffered checks with its letter dated May

---

4. Among the specific areas of non-compliance mentioned in the series of letters were missing or incorrect documents (including the lease and rider signed by Stetzer and the landlord of the leased property, a copy of the "Request for Dunkin' Donut Site Approval" form signed by the landlord, a missing page in the letter of intent, a franchise/site information sheet), failure to submit proper automatic traffic counts in front of the proposed location, and failure to pay the franchise and grand opening fees. In addition, a number of Dunkin's letters referred to a Feb. 6, 1997 telephone conversation between Stetzer and Zuromski, and to letters to Stetzer dated Mar. 26, 1996 and Dec. 17, 1996 regarding specific areas of non-compliance, including the missing documents and fees.

9, 1997, referring therein to its previous letters.

Stetzer responded by letter dated May 21, 1997, asserting his compliance with the relevant procedures and re-submitting the franchise and grand opening fees.[5] Stetzer also reiterated his request for an extension of time in which to open the new shop.

Dunkin' again denied Stetzer's requested extension and returned the proffered checks with its letter dated June 2, 1997, emphasizing that it would not grant the requested extension because of Stetzer's "continued failure to meet the standard basic requirement of Dunkin' Donuts new store development procedures . . . ."

Stetzer wrote again to Dunkin' on June 7, 1997, contending that he had complied with all of Dunkin's requirements, and requesting more specific information as to the alleged instances of non-compliance.

Dunkin' responded by letter dated June 20, 1997, notifying Stetzer that the site approval had expired and that no extension of time would be granted. Dunkin' again referred to its prior letters in which it had informed Stetzer of specific areas of non-compliance with required procedures, repeatedly demanded payment of the franchise fees and grand opening fees, and repeatedly warned Stetzer in emphatic, underlined, and italicized terms that the consequence of continued non-compliance would be suspension of any further site development and/or assistance by Dunkin' Donuts staff. Dunkin' also demanded that Stetzer immediately cease all efforts to develop the site.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Fed.

R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There is no genuine issue of material fact if the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Id.* at 255, 106 S.Ct. 2505. If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### DISCUSSION

#### I. Breach of Contract Claims

Plaintiffs assert breach of contract claims in Counts One and Two of their Complaint, alleging that Dunkin' breached the EDA and the letter agreement by, *inter alia,* failing to execute a franchise agreement for the Hemingway Avenue site as required in paragraph 5A of the EDA and by refusing to grant an extension of time in which to open the new store. Dunkin' counters that Plaintiffs' breach of contract claims are barred by failure of consideration because Plaintiffs failed to remit the franchise fees when due. Dunkin' argues that the terms of the letter agreement requiring payment of the franchise fees within fourteen days modified the terms of the EDA requiring payment of the fees upon execution of the franchise agreement, and that the more specific, negotiated terms of the letter agreement control over the boilerplate terms of the EDA. Dunkin' further argues that it was

---

**5.** Although the Site Approval letter agreement calls for a ten-year franchise fee of $5,000, the parties agreed during the development period

to increase the franchise term to twenty years, thereby increasing the franchise fee to $10,-000.

under no obligation to give Plaintiffs additional time to open the new store.

As an initial matter, the Court finds that Grando, Inc. was not a party to the EDA or the letter agreement, and therefore has no standing to assert a breach of contract of claim based on those agreements. Therefore, the Court GRANTS Defendant's motion as to Grando, Inc. with respect to the breach of contract claims set forth in Counts One and Two of the Complaint. For simplicity, any further reference to "Plaintiffs" with respect to the breach of contract claims refers only to Stetzer and 4 Donuts.

### A. Modification and Ambiguous Terms

■ Our analysis is guided by the general principles governing the construction of contracts.[6] "The intention of the parties to a contract governs the determination of the parties' rights and obligations under the contract." Analysis of the contract focuses on the intention of the parties as derived from the language employed. Where the terms of an agreement are unambiguous, the parties are bound by the plain terms of their contract and their subjective intents are immaterial. *See Davis v. Dawson, Inc.*, 15 F.Supp.2d 64, 107 (D.Mass.1998). However, if the contractual language is "susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper." *Aetna Casualty & Surety Co. v. Giesow*, 412 F.2d 468, 471 (2d Cir.1969). The individual clauses of a contract cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part. A contract should be construed so as to give full meaning and effect to all of its provisions. *Levine v. Advest, Inc.*, 244 Conn. 732, 714 A.2d 649, 660 (1998). "A writing

is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." *Restatement (Second) of Contracts* § 202(2) (1979); *see Lipton Professional Soccer, Inc. v. Bay State Harness Horse Racing, Inc.*, 8 Mass.App. Ct. 458, 395 N.E.2d 470, 473 (1979).

■ We commence our analysis by determining that the EDA and the letter agreement are part of the same transaction, *viz.*, the development of the Hemingway Avenue site. The letter agreement specifies the development and fee payment schedules for the Hemingway Avenue site, adding to and modifying the more general terms of the EDA which control the development of additional units. Therefore, we interpret the terms of the EDA and the letter agreement together, construing them as a whole so as to give full effect to all of the provisions, and, accordingly, we consider Counts One and Two together.

■ Plaintiffs claim that the letter agreement did not modify "the EDA term that required payment of the fees upon execution of the franchise agreement, despite the bold-faced and underlined language in the letter agreement declaring that the amount(s) listed below **_are due no later than fourteen (14) days after the date of the letter._**" Plaintiffs urge the Court to find ambiguity created by the first sentence of the letter agreement ("In accordance with the terms of your franchise agreement ..."). Even construing all inferences in favor of the Plaintiffs, the Court is not convinced. "Where ambiguity exists, the minor provision must be construed as not to conflict with main purpose of the contract." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1131 (3d Cir. 1969) (citing *Williston, Interpretation and Construction of Contracts*, Ch. 22, § 619). This Court will not strain to find ambigui-

---

6. A court sitting in diversity applies the choice of law provisions of the state in which it is located. The EDA states that it is governed by Massachusetts law. EDA ¶ 20. The letter agreement contains no choice of law provision. Because the basic principles of contract law are identical in Massachusetts and Connecticut law, we are guided by case law from both jurisdictions.

ty. Plaintiffs were aware that no franchise agreement had been executed when they agreed to and accepted the letter agreement's terms.[7] We find the meaning of the terms of the letter agreement clear and unmistakable. Plaintiffs were bound by the letter agreement's term requiring payment by June 29.[8]

### B. Failure of Consideration

■ We next examine Defendant's failure of consideration argument. Failure of consideration occurs when, because of some supervening cause after an agreement is reached, the promised performance fails. *Williston on Contracts* 4th ed. § 7:11, at 145. Under Massachusetts law, "the right to rescind a contract on the ground of failure of consideration exists only where the failure of consideration amounts to an abrogation of the contract, or goes to the essence of it, or takes away its foundation." *DeAngelis v. Palladino*, 318 Mass. 251, 61 N.E.2d 117, 120 (1945).

The question then becomes whether Plaintiffs' failure to pay the franchise fees by the due date constitutes failure of consideration. There is no dispute that Defendant rejected Plaintiffs' attempted tender of the fees in April, 1997. Defendant argues it was justified in rejecting Plaintiffs' payment because Plaintiffs conditioned payment of the fees upon receiving the requested extension of time to open the store. Defendant also argues that time was of the essence with regard to the

payment of the fees, although the parties did not so state in the letter agreement.

■ The fact that a contract states a date for performance does not necessarily make time of the essence. *Grenier v. Compratt Constr. Co.*, 189 Conn. 144, 454 A.2d 1289, 1293 (1983); *see also Curley v. Mobil Oil Corp.*, 860 F.2d 1129 (1st Cir. 1988) (quoting *Limpus v. Armstrong*, 3 Mass.App.Ct. 19, 322 N.E.2d 187, 189–90 (1975)). When a contract does not explicitly state that time is of the essence, the court must consider "the intent of the parties, to be determined, as a matter of fact, from the language of the contract, the circumstances attending its negotiation, and the conduct of the parties in relation thereto" in order to determine whether late performance is deemed substantial performance of the contract. *Kakalik v. Bernardo*, 184 Conn. 386, 439 A.2d 1016, 1019 (1981) (citations omitted). While time is not "ordinarily of the essence," it "may be made so by clear manifestation of the intent of the parties in the contract itself, [or] by subsequent notice from one party to another ...." *Curley v. Mobil Oil Corp.*, 860 F.2d at 1132 (quoting *Mansfield v. Wiles*, 221 Mass. 75, 108 N.E. 901 (1915)). Thus, the trier of fact must determine whether the parties' intent to make time of the essence was clearly manifested in the letter agreement, or, in the alternative, whether Defendant gave subsequent notice to the Plaintiffs of its intent to make time of the essence with respect to the due date for the payment of the franchise fees.

---

7. Although Plaintiffs claim that the duty to execute and deliver the franchise agreement belonged to Defendant, the EDA is clear in assigning that burden to the Plaintiffs. Paragraph 5A of the EDA states:

> For each unit to be opened under this Agreement, Licensee shall execute and deliver to Licensor, Licensor's then current standard form Franchise Agreement applicable to the type of unit (producing, satellite, kiosk, cart, other) to be opened by Licensee.... The Franchise Agreement for each additional unit shall be Franchisor's then current standard form Agreement applicable to the type of unit and shall be

> executed and delivered at the time Licensor approves each location....

Thus, according to the terms of the EDA, Plaintiffs, as licensees, were obligated to execute and deliver Defendant's "then current standard form Agreement" and to pay the required franchise fees at the time Defendant approved the site.

8. In light of Plaintiffs' attempted payment of the fees some ten months after the date of the letter agreement, the Court does not consider the four day discrepancy between the due dates set out in the letter agreement to be material. *See supra* note 2.

In addition, even if the Court were to find that time was of the essence, the trier of fact must consider whether Defendant waived strict compliance with the deadline for the payment by its continued cooperation with the Plaintiffs during the ten month period after the letter agreement was signed.

■ Under Massachusetts law, a party can waive a time-is-of-the-essence provision through speech or conduct indicating that the provision is no longer of importance. *Federal Deposit Ins. Corp. v. Slinger*, 913 F.2d 7, 12 (1st Cir.1990) (citing *Gentile Bros. Corp. v. Rowena Homes, Inc.*, 352 Mass. 584, 227 N.E.2d 338, 342 (1967) (holding time-is-of-the-essence clause waived where neither party indicated that failure to perform on specified date would "spell the end of the agreement")). Here, Defendant repeatedly demanded payment and missing documents until at least April 16, 1997, threatening to suspend its cooperation with Plaintiffs' development of the new store, but not to rescind the contract completely.

■ Thus, a genuine question of material fact exists as to whether Defendant acquiesced in Plaintiffs' delay in tendering the franchise fees, thereby waiving the right to demand strict compliance with the contractual provisions. The trier of fact must determine whether Plaintiffs' proffered payment in April, 1997 occurred within a reasonable time and whether Defendant's rejection of the proffered payment was reasonable. *See Bradford Novelty Co. v. Technomatic, Inc.*, 142 Conn. 166, 112 A.2d 214, 216 (1955); *Davis v. Dawson, Inc.*, 15 F.Supp.2d 64, 120 (D.Mass.1998); *Church of God in Christ, Inc. v. Congregation Kehillath Jacob*, 370 Mass. 828, 353 N.E.2d 669, 672 (1976) (oral conversation and other conduct reasonably led the plaintiff to believe there was extension of agreement; waiver therefore resulted and time "was not of the essence"); *Kattor v. Adams*, 323 Mass. 686, 84 N.E.2d 124, 126 (1949) (inferring that .3 ½-year delay was reasonable where both parties appeared to have acquiesced in delay).

Because Plaintiffs' breach of contract claims are replete with factual disputes best submitted to the trier of fact, this Court cannot say as a matter of law that Plaintiffs' promised performance was untimely so as to constitute failure of consideration.

### C. Defendant's Refusal to Extend Time to Open New Store

Defendant further argues that Plaintiffs' allegations, even if true, do not constitute a breach of the parties' agreement. Specifically, Defendant asserts that it was under no obligation to extend the letter agreement's one-year deadline to open the new store. Plaintiffs counter that the language in the letter agreement which warns that "[f]ailure to have the site opened for business will result in the site going back for review for approval" is ambiguous, and that Defendant had assured them that the approval would be renewed. Plaintiffs seek to introduce parol evidence regarding the telephone conversation with Zuromski to explain the ambiguous term.

■ The terms of a written contract intended by the parties to set forth their entire agreement may not be varied by parol evidence. *Kronholm v. Kronholm*, 16 Conn.App. 124, 547 A.2d 61, 65 (1988), *aff'd*, 23 Conn.App. 577, 582 A.2d 1178 (1990). However, parol evidence may be considered if relevant and if an agreement has been shown not to be integrated. *HLO Land Ownership Assocs. Ltd. Partnership v. Hartford*, 248 Conn. 350, 727 A.2d 1260, 1265 (1999).

■ We agree with the Plaintiffs that the disputed language does not make it clear that failure to have the site opened for business by June 11, 1997 would terminate the parties' contractual relationship. Thus, the Plaintiffs are entitled to offer extrinsic evidence to the trier of fact in order to explain the ambiguous term. Moreover, although the EDA is an inte-

grated agreement, the letter agreement does not purport to represent the final and complete agreement of the parties regarding the Hemingway Avenue site development. Thus, the Plaintiffs are entitled to offer extrinsic evidence to the trier of fact in order to vary and even to contradict the disputed term.

Drawing all inferences in favor of the non-moving party, as we are required to do when considering a motion for summary judgment, we find that genuine issues of material fact exist which must be submitted to the trier of fact, precluding summary judgment on the breach of contract claims. Therefore, we DENY Defendant's motion for summary judgment as to Counts One and Two.

## II. Connecticut Franchise Act Claim

Plaintiffs allege in Count Three that Dunkin's actions violated the Connecticut Franchise Act, Conn. Gen.Stat. § 42–133e–h, in that Dunkin' terminated or failed to renew its approval for the Hemingway Avenue franchise site without good cause and without sixty days prior written notice. *See* Conn. Gen.Stat. § 42–133f(a). Plaintiffs urge the Court to find that Defendant granted a franchise based on the EDA and the letter agreement, despite the fact that Defendant did not sign the written franchise agreement. Defendant argues that the Franchise Act does not apply because there was no franchise relationship between the parties with respect to the Hemingway Avenue site. Defendant relies on the fact that it did not sign the written franchise agreement and further argues that neither the EDA nor the letter agreement constituted a franchise as defined by the Franchise Act. We note that the application of a statute is a matter of law for the Court to decide in the first instance.

The Connecticut Franchise Act defines "franchise" as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor ...; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate ...." Conn. Gen. Stat. § 42–133e(b). The statute prohibits franchisors from terminating or canceling a franchise except for good cause and requires franchisors to "give the franchisee written notice of such termination [or] cancellation ... at least sixty days in advance to such termination [or] cancellation with the cause stated thereon ...." Conn. Gen. Stat. § 42–133f(a). The statute prohibits any contractual waiver of a franchisee's statutory protections and overrides any contractual provisions to the contrary in a covered franchise agreement. *Rudel Machinery Co., Inc. v. Giddings & Lewis, Inc.*, 68 F.Supp.2d 118, 123 (D.Conn.1999).

The Franchise Act's remedial purpose, "to prevent a franchisor from unfairly exerting economic leverage over a franchisee," indicates that the statute must be liberally construed in favor of those whom the legislature intended to benefit. *Hartford Elec. Supply Co. v. Allen–Bradley Co., Inc.*, 250 Conn. 334, 736 A.2d 824, 831 (1999); *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1180 (2d Cir.1995), *cert. denied*, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). As a threshold matter, however, we must first consider whether Plaintiffs are among the class entitled to benefit from the protections of the Act.

Defendant does not dispute that the EDA and the letter agreement would have permitted the Plaintiffs to operate the Hemingway Avenue store "under a marketing plan or system prescribed in substantial part" by Dunkin'. In addition, we need not address the second prong of the franchise definition, which requires that "the operation of the franchisee's business pursuant to such plan or system [be] substantially associated with the franchisor's trademark ...." Defendant does not dis-

pute that the operation of the prospective business, when opened, would be substantially associated with Dunkin's trademark. To determine whether a franchise existed in this case, the Court must first consider whether an oral or written agreement or arrangement existed in which Defendant granted Plaintiffs the right to engage in the business of offering, selling, or distributing its goods.

 In determining whether a franchise exists, a court must take into account not only the language of the parties' agreements but also the parties' conduct. The absence of a formal written agreement is not determinative. *See Hartford Elec. Supply*, 736 A.2d at 832 ("The relationship of the parties, pursuant to § 42–133e(b)(1) is not governed solely by the parties' main written agreement."). The statutory test is whether the parties' conduct, in addition to their words, constitutes an agreement or arrangement. *Id.*

 In this case, Defendant granted Plaintiffs a license "to develop . . . and to operate pursuant to Franchise Agreements" specified and additional franchise units. EDA para. 1. There is no dispute that there was no written franchise agreement in force for the Hemingway Avenue unit. Nonetheless, Plaintiffs urge the Court to find that Defendant granted a franchise based on the language used in the EDA and the letter agreement. The letter agreement, however, merely granted Plaintiffs the conditional right to develop and to open the Hemingway Avenue store, subject to Plaintiffs' compliance with a lengthy list of requirements, including payment of the franchise fees and adherence to Defendant's "Multi–Unit Guidelines." Thus, we find no grant of a franchise in the language of the EDA or the letter agreement.

Similarly, we find no franchise based on the parties' conduct. Defendant communicated with Plaintiffs numerous times throughout the development period in an attempt to secure Plaintiffs' compliance with the required procedures. Nothing in the record indicates that Defendant had given Plaintiffs anything more than the conditional right to develop the site. Thus, we find that the parties' words and conduct indicate that Defendant had not yet granted Plaintiffs a franchise for the Hemingway Avenue site and that Plaintiffs were merely prospective franchisees in the process of developing the franchise site.

We have found no authority to support the proposition that the Connecticut Franchise Act applies to prospective franchisees. Absent guidance from the Connecticut courts in construing this aspect of the Franchise Act, we are reluctant to extend the scope of the Franchise Act to prospective franchisees. Because we conclude that there was no franchise relationship between the parties and that the Franchise Act does not apply in this case, we GRANT Defendant's motion for summary judgment with respect to Count Three.

### III. Bad Faith Claim

Plaintiffs allege in Count Four that Defendant's conduct constituted bad faith business conduct which was extreme, outrageous, and willful. We assume that Plaintiffs intended to claim that Dunkin' breached the implied covenant of good faith and fair dealing, a cause of action in tort applied by Connecticut courts in "a variety of contractual relationships." *Buckman v. People Express, Inc.*, 205 Conn. 166, 530 A.2d 596, 599 (1987). Defendant argues that there was no contract due to failure of consideration; hence, there was no implied covenant of good faith and fair dealing. Having rejected Defendant's failure of consideration argument as raising genuine issues of material fact with respect to Plaintiffs' breach of contract claims, we cannot summarily dismiss the bad faith claim. We therefore proceed to examine the standard for a bad faith claim.

 Bad faith is the absence of good faith and generally implies "a design to mislead or to deceive another, or a neglect

or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." *Id.* at 599–600.

■ In support of their bad faith claim, Plaintiffs have offered letters dated August 12 and December 16, 1996 to Dunkin' from a neighboring franchisee protesting the proposed Hemingway Avenue unit's encroachment on its trade area. Plaintiffs argue that the letters support an inference that Dunkin's true purpose in refusing to renew the site approval was anti-competitive and prompted by a dishonest purpose rather than an honest mistake as to its rights or duties. Defendant counters with its March 21, 1997 letter responding to the neighboring franchisee in which it expressed disagreement that the new site would be a significant competitor. Because Plaintiffs have offered evidence of a dishonest purpose that is more than mere conjecture or speculation, and because Defendant has failed to sustain its burden of showing the absence of a genuine issue of material fact, Defendant's motion for summary judgment as to this Count is DENIED.

## IV. CUTPA Claim

In Count Five, Plaintiffs claim that Dunkin' violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42–110a–q. Plaintiffs reiterate the breach of contract and bad faith claims and allege that the conduct underlying those claims constitutes unfair and/or deceptive trade practices.

■ CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a).

The Connecticut Supreme Court has adopted the criteria set out in the so-called "cigarette rule," promulgated by the Federal Trade Commission to determine whether a practice is unfair or deceptive. *See Federal Trade Comm'n v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). The cigarette rule's three criteria are:

(1) whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory or other established conduct of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors, or other businessmen) ]. ·

*Id.; see also McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 473 A.2d 1185, 1190 (1984). All three criteria need not be satisfied. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp.,* 245 Conn. 1, 717 A.2d 77, 100 (1998).

■ The Court has already determined that Defendant has failed to sustain its burden to show the absence of genuine issues of material facts with respect to Plaintiffs' breach of contract and bad faith claims. If proven, Defendant's conduct in terminating the site approval of the Hemingway Avenue franchise because of the competing franchisee's protests could support a finding that CUTPA was violated. *See Hartford Electric Co. v. Allen–Bradley Co., Inc.,* 250 Conn. 334, 736 A.2d 824, 843 (1999) (termination of franchise without good cause violated Franchise Act and CUTPA by offending public policy of promoting fairness among businesses). As in the breach of contract and bad faith claims, the factual disputes underlying the CUTPA claim preclude summary judg-

116

ment. We therefore DENY Defendant's motion for summary judgment on this Count.

## V. Promissory Estoppel Claim

Plaintiffs assert promissory estoppel in Count Six of the Complaint, alleging that they relied to their detriment on Defendant's promise of additional time to open the new store.

"Under the law of contract, a promise is not generally enforceable unless it is supported by consideration ... This court has recognized, however, the development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor." *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 520 A.2d 217, 221 (1987) (citations omitted). The Restatement Second of Contracts § 90 defines the doctrine of promissory estoppel as "[a] promise which the promisor would reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [and] is binding if injustice can be avoided only by enforcement of the promise ... A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could have reasonably have expected to induce reliance." *Id.*

Under Connecticut law, "any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." *Chotkowski v. State,* 240 Conn. 246, 690 A.2d 368, 380 (1997) (internal quotation marks omitted).

In considering Plaintiffs' breach of contract claims, we have already deter-

mined that Plaintiffs are entitled to offer evidence to the trier of fact regarding Defendant's promise to grant additional time to Plaintiffs to develop and open the store. Plaintiffs are entitled to present alternative theories of liability in their complaint and are entitled to show that they relied on Defendant's promise even if Defendant prevails on the breach of contract claim. Because the parties dispute whether Defendant promised to extend the time limit for opening the new store, a genuine issue of material fact exists which must be submitted to the trier of fact. Thus, we DENY Defendant's motion for summary judgment on this Count.

## CONCLUSION

For the foregoing reasons, Defendant's summary judgment motion [Doc. # 21–1] is GRANTED with respect to Counts One and Two as to Plaintiff Grando, Inc., GRANTED with respect to Count Three as to all Plaintiffs, and DENIED with respect to all other Counts.

SO ORDERED.